NORTHEAST OHIO REGIONAL SEWER DISTRICT ET AL., APPELLANTS, *v.* SHANK, DIRECTOR OF ENVIRONMENTAL PROTECTION, APPELLEE.

[Cite as Northeast Ohio Regional Sewer Dist. *v.* Shank (1991), 58 Ohio St. 3d 16.]

(No. 89-1554—Submitted October 16, 1990—Decided February 27, 1991.)

*Lee I. Fisher,* attorney general, *Jack A. Van Kley* and *Margaret A. Malone,* for appellee.

*Squire, Sanders & Dempsey, Van Carson* and *Lisa E. Hollander,* for appellants.

*William B. Schatz,* for appellant Northeast Ohio Regional Sewer District.

HOLMES, J. One of the great American concerns of this century which was debated and acted upon by

the United States Congress was that relating to the improvement of our natural environmental resources. Significant among the laws enacted with the public purpose of upgrading our environment were those relating to the quality of the water in our lakes, rivers and streams. Most notable in this regard was the FWPCA. The FWPCA set long-range water quality standard requirements for the states. Section 1251(a), Title 33, U.S. Code. Pursuant to Section 303(c) of the FWPCA, Section 1313(c), Title 33, U.S. Code, the states must assess the potential uses of the rivers in the states, such as public water supply, fishing, wildlife propagation, recreation, agriculture, industry, etc. Federal regulations were promulgated to implement the congressional mandates of the FWPCA.

The Ohio General Assembly amended R.C. Chapter 6111 in accordance with the mandates of the FWPCA. R.C. 6111.041 requires the Director of Environmental Protection to:

"* * * adopt standards of water quality to be applicable to the waters of the state. Such standards shall be adopted pursuant to a schedule established, and from time to time amended, by the director, to apply to the various waters of the state, in accordance with Chapter 119. of the Revised Code. Such standards shall be adopted in accordance with section 303 of the 'Federal Water Pollution Control Act' and shall be designed to improve and maintain the quality of such waters for the purpose of protecting the public health and welfare, and to enable the present and planned use of such waters for public water supplies, industrial and agriculture needs, propagation of fish, aquatic life, and wildlife, and recreational purposes. Such standards may be amended from time to time as determined by the director. * * *"

Section 303(c)(2) of the FWPCA, Section 1313(C)(2), Title 33, U.S. Code,[3] provides that when a state revises or adopts a new water quality standard, such standard shall consist of the designated uses of the waters involved and contain the water quality criteria based upon such uses.

The federal EPA regulation that implemented Section 303(c) of the Clean Water Act provides:

"* * * States adopt water quality standards to protect public health or welfare, enhance the quality of water and serve the purposes of the Clean Water Act (the Act). 'Serve the purposes of the Act' (as defined in sections 101(a)(2) and 303(c) of the Act) means that water quality standards should, wherever attainable, provide water quality for the protection and propagation of fish, shellfish and wildlife and for recreation in and on the water and take into consideration their use and value of public water supplies, propa-

---

[3] "Whenever the State revises or adopts a new standard, such revised or new standard shall be submitted to the Administrator. Such revised or new water quality standard shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses. Such standards shall be such as to protect the public health or welfare, enhance the quali- ty of water and serve the purposes of this Act. Such standards shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation." Section 1313(c)(2), Title 33, U.S. Code.

gation of fish, shellfish and wildlife, recreation in and on the water, and agricultural, industrial, and other purposes including navigation.* * *'' Section 131.2, Title 40, C.F.R.

In carrying out the requirements of the FWPCA, federal EPA regulations thereunder, and the Ohio EPA's regulations, the Director began evaluating rivers and streams in Ohio, including the Cuyahoga, to determine the degree of pollution and water quality, and to eventually establish water use and quality standards for such rivers and streams and to determine the necessary orders to be issued to those discharging wastes or sewage into, or affecting the quality of those waters.

The record before the Director evinces that at one time the waters in the Cleveland area, including nearby portions of Lake Erie, the Cuyahoga River and other nearby Lake Erie tributaries, supported a commercial fishing industry worth more than $8 million per year. Significant additional revenues were realized from the area's sport fishing industry, including income from the sale of boats, motors, tackle, bait, gasoline, and lodging, and from other dependent businesses. The Cuyahoga River itself held an abundance of game fish.

However, urban waste eventually despoiled the river. The pollution became so marked that in the 1960s, as it was reported, and unfortunately highlighted in national news, occasionally material on the Cuyahoga River caught fire. The fish population in the area was also decimated, and fishing, both commercial and recreational, came to a halt. The economic loss to the Cleveland area, and to Ohio generally, was considerable.

The Director determined that a full review of available scientific data relative to river quality and additional chemical samplings and study were necessary prior to designating uses of the river. Thereafter, the Ohio EPA, as stated previously, carried out numerous chemical sampling programs in 1984, collecting many chemical water samples in the Cuyahoga Basin study area. In addition to the new chemical data, the Ohio EPA drew upon voluminous existing chemical and aquatic life data. All of these data were collected and collated before the Ohio EPA designated the use for the lower Cuyahoga segment.

I

As their first proposition of law, the appellants claim that the Director's rule which designated the lower Cuyahoga segment as a warmwater habitat should be invalidated because the Director had failed to quantify the economic impact of the WWH use designation. Based upon the following analysis, we disagree.

In evaluating the appellants' claim, we must study the language of the FWPCA and its associated regulations. The FWPCA states that water quality "standards shall be established taking into consideration" the various enumerated factors. Section 1313(c)(2), Title 33, U.S. Code (see fn. 3, *supra*). Moreover, the applicable federal regulation states that the state should "take into consideration" the various factors enumerated. We must therefore determine what Congress requires by the phrase "take into consideration."

In evaluating a similar phrase "take into account" in another section of the FWPCA, Section 304(b)(1)(B) (Section 1314[b][1][B], Title 33, U.S. Code), the court in *Weyerhaeuser Co. v. Costle* (C.A. D.C. 1978), 590 F. 2d 1011, observed that "* * * Congress did not mandate any particular structure or weight for the many considera-

tion factors. Rather, it left EPA with discretion to decide how to account for the consideration factors, and how much weight to give each factor. * * * More particularly, we do not believe that EPA is required to use any specific structure such as a balancing test in assessing the consideration factors, nor do we believe that EPA is required to give each consideration factor any specific weight." *Id.* at 1045.

This reasoning should also be applied to this case, as Section 303(c)(2) of the FWPCA also lacks mandatory language requiring a state to give equal weight to each factor listed. The *Weyerhaeuser* case indicates that the amount of weight given to each individual factor rests entirely within the discretion of an individual state.

The history of regulations implementing the FWPCA also supports our decision to reject this claim as to the invalidity of the classification. In 1982, the federal EPA proposed regulations which required states to balance the expected value of a proposed change in use designation against its costs to the dischargers. Proposed Section 131.11(b), Title 40,

C.F.R., 47 Fed. Reg. 49234, 49236-49237 (Oct. 29, 1982). However, this cost/benefit analysis was eliminated after adverse comment and does not appear in the final draft of the regulations. Section 131.10, Title 40, C.F.R., see 48 Fed. Reg. 51400-51401 (Nov. 8, 1983). Accordingly, a state is not expressly required by the FWPCA to consider the costs to polluters when modifying a use designation.[4]

R.C. 6111.041 instructs the Director to adopt water quality standards in accordance with Section 303 of the FWPCA. Since Section 303 of the FWPCA does not expressly require a cost/benefit analysis, we conclude that the Director's failure to quantify the expected costs to those who pollute the lower Cuyahoga River will not, standing alone, invalidate the WWH use designation. However, at a subsequent time economic factors may well be considered after the use designation is in place and a discharger requests a variance to temporarily excuse compliance. A discharger may obtain a temporary variance from water quality criteria under Ohio Adm. Code 3745-1-01(G)(1) if it is determined that

------

[4] Over the years, the procedures by which the Ohio EPA evaluated and adopted water quality standards have undergone certain modifications. In 1981 the EPA utilized comprehensive water quality reports. These reports, in addition to containing various data on the relevant physical, geological and biological characteristics of the various rivers, river systems and drainage basins under review, contained waste load allocation studies which identified the pollutants contained in the particular waterway and determined the amount—or load—which the waterway could contain and still comply with the water quality standards and designated use for that waterway. These waste loads were then allocated proportionally among the dischargers into the waterway. The waste load allocation studies also included economic studies of the economic effect of the proposed standards on the affected areas.

In 1986 the Ohio EPA changed the practice and discontinued the preparation of formal comprehensive water quality reports. The EBR in its final order found that "[t]he record demonstrates that, with the exception of the wasteload allocation study and financial analysis, the study of the Cuyahoga River, including the study plan, the chemical and biological fieldwork, and the research done in furtherance of the adoption of the water quality standards in question here, was substantially the same, if not identical, to the study and preparation necessary to prepare a formal CWQR."

"* * * meeting * * * [the] criteria would cause substantial and widespread economic and social impact to the total affected community * * *[.]" This variance provision, expressly permitted by Section 131.13, Title 40, C.F.R., is an alternative to a subsection of the federal EPA water quality regulations allowing states to remove designated uses in the event of such an economic impact. Section 131.10(g)(6), Title 40, C.F.R.

In conclusion, because neither the FWPCA nor Ohio law requires cost/benefit economic data, and, in that such data may be developed at a later time as indicated above, we decline to accept the appellants' argument that the warmwater habitat use designation must be invalidated.

In addition to requiring standards in accordance with Section 303 of the FWPCA, R.C. 6111.041 requires that any promulgation of water quality standards in Ohio must also comply with R.C. Chapter 119, which governs the procedure an agency must follow when adopting a rule. These requirements, enumerated in R.C. 119.03, include public notice, filing with the ex-

ecutive and legislative branches of government, public hearing, and notification of persons especially affected by the rule. In addition, R.C. 119.03 requires that a fiscal analysis of the proposed rule be attached to it and filed with the Secretary of State, the Legislative Service Commission[5] and the Joint Committee on Agency Rule Review ("JCARR").[6] This fiscal analysis must be prepared under R.C. 121.24 or 127.18.

Appellants challenge the adequacy and content of the Director's fiscal analysis, particularly the failure of the analysis to estimate expected costs to all directly affected persons. In addressing this claim we must construe the requirement of a fiscal analysis as codified at R.C. Chapter 119 to ascertain, declare and give effect to the legislative intent. *State* v. *Hooper* (1979), 57 Ohio St. 2d 87, 11 O.O. 3d 250, 386 N.E. 2d 1348; *Henry* v. *Central Natl. Bank* (1968), 16 Ohio St. 2d 16, 45 O.O. 2d 262, 242 N.E. 2d 342; *State, ex rel. Myers,* v. *Bd. of Edn. of Spencer Twp.* (1917), 95 Ohio St. 367, 116 N.E. 516.

The legislature has set forth re-

---

[5] R.C. 119.03(B) provides:

"One copy of the full text of the proposed rule, amendment or rule to be rescinded, accompanied by one copy of the public notice required under division (A) of this section, shall be filed with the secretary of state. Two copies of the full text of the proposed rule, amendment, or rule to be rescinded, accompanied by two copies of the public notice required under division (A) of this section, shall be filed with the director of the legislative service commission. * * * The agency shall attach a copy of the rule summary and fiscal analysis prepared under section 121.24 or 127.18 of the Revised Code, or both, to each copy of a proposed rule or proposed rule in revised form that is filed with the secretary of state or the director of the legislative service commission."

[6] R.C. 119.03(H) provides:

"When any agency files a proposed rule, amendment, or rescission under division (B) of this section, it shall also file with the joint committee on agency rule review two copies of the full text of the proposed rule, amendment, or rule to be rescinded in the same form and two copies of the public notice required under division (A) of this section. * * * An agency shall attach one copy of the rule summary and fiscal analysis prepared under section 121.24 or 127.18 of the Revised Code, or both, to each copy of a proposed rule, amendment or rescission, and to each copy of a proposed rule, amendment, or rescission in revised form, that is filed under this division."

quirements for the rule summary and fiscal analysis at R.C. 121.24(A)(6). According to this section:

" '[R]ule summary and fiscal analysis' means a rule summary and fiscal analysis of a proposed rule that provides the information required by division (B) of section 127.18 of the Revised Code *and* that has been prepared in the form prescribed by the joint committee on agency rule review under division (E) of that section." (Emphasis added.) R.C. 121.24(A)(6).

Pursuant to R.C. 127.18:

"A rule-making agency shall prepare, in the form prescribed by the joint committee on agency rule review under division (E) of this section, a complete and accurate rule summary and fiscal analysis of each proposed rule that it files under division (D) of section 111.15 or division (H) of section 119.03 of the Revised Code. The rule summary and fiscal analysis shall include all of the following information:

"(1) The name, address, and telephone number of the rule-making agency, and the name and telephone number of an individual or office within the agency designated by that agency to be responsible for coordinating and making available information in the possession of the agency regarding the proposed rule;

"(2) The Ohio administrative code rule number of the proposed rule;

"(3) A brief summary of, and the legal basis for, the proposed rule, including citations identifying the statute that prescribes the procedure in accordance with which the rule-making agency is required to adopt the proposed rule, the statute that authorizes the agency to adopt the proposed rule, and the statute that the agency intends to amplify or implement by adopting the proposed rule;

"(4) An estimate, in dollars, of the amount by which the proposed rule would increase or decrease revenue or expenditures during the current biennium;

"(5) A citation identifying the appropriation that authorizes each expenditure that would be necessitated by the proposed rule;

"(6) A summary of the estimated cost of compliance with the rule to all directly affected persons;

"(7) The reasons why the rule is being proposed;

"(8) Any other information the joint committee on agency rule review considers necessary to make the proposed rule or the fiscal effect of the proposed rule fully understandable."

The Director's rule summary and fiscal analysis addressed each of the first seven requests for information enumerated in R.C. 127.18(B). Appellants, however, allege that the Director's response to R.C. 127.18 (B)(6) was inadequate, and that, therefore, the entire fiscal analysis is invalid. Because the appellant's unduly narrow reading of R.C. 127.18(B) does not reasonably accommodate the legislative intent of R.C. Chapter 119, we disagree.

In *Cochrel* v. *Robinson* (1925), 113 Ohio St. 526, 149 N.E. 871, this court held at paragraph four of the syllabus that:

"In the construction of a statute the primary duty of the court is to give effect to the intention of the Legislature enacting it. Such intention is to be sought in the language employed and the apparent purpose to be subserved, and such a construction adopted which permits the statute and its various parts to be construed as a whole and give effect to the paramount object to be attained."

Recently, in a unanimous *per curiam* opinion, this court addressed the purpose of R.C. Chapter 119 and held that " '[t]he rulemaking requirements set forth in R.C. Chapter 119 are designed to permit a full and

fair analysis of the impact and validity of a proposed rule.* * *' " *Ohio Nurses Assn., Inc.* v. *Ohio State Bd. of Nursing Edn. & Nurse Registration* (1989), 44 Ohio St. 3d 73, 76, 540 N.E. 2d 1354, 1357, quoting *Condee* v. *Lindley* (1984), 12 Ohio St. 3d 90, 93, 12 OBR 79, 81, 465 N.E. 2d 450, 452. Moreover, from a reading of R.C. Chapter 119 as a whole, it is apparent that the General Assembly intended "to provide an opportunity for opponents of a proposed regulation to express their views as to the wisdom of the proposal and to present evidence with respect to its illegality." *Ohio Grape Growers, Vintners & Bottlers Assn.* v. *Bd. of Liquor Control* (1961), 115 Ohio App. 243, 245, 20 O.O. 2d 320, 321, 184 N.E. 2d 767, 768.

In evaluating the Director's response to R.C. 127.18(B)(6), we cannot say that the information provided was so inadequate that an interested party would be deprived of an opportunity to challenge the impact and validity of the proposed rule. Because the Director's rule summary and fiscal analysis construed as a whole were sufficient to give effect to the paramount objective of R.C. Chapter 119, we conclude that the Director's responses to R.C. 127.18(B) were adequate.

Moreover, JCARR is authorized to reject a proposed rule if its fiscal analysis is inadequate:

"* * * The joint committee on agency rule review shall not accept any proposed rule for filing unless a copy of the rule summary and fiscal analysis of the proposed rule, completely and accurately prepared, has been attached to each copy of the proposed rule." R.C. 127.18(C).

As evidenced by the plain language of this statute, the legislature has vested JCARR with autonomy and discretion to evaluate the content of a rule summary and fiscal analysis.

In the instant case, by accepting the proposed rule, JCARR concluded that the rule summary and fiscal analysis submitted by the Director were adequate. Pursuant to the discretion granted to it by the legislature at R.C. 127.18(C), JCARR was authorized to so conclude. Consequently, we will not substitute our judgment for that of JCARR and reevaluate the adequacy of the Director's fiscal analysis.

Because we conclude that the fiscal analysis filed by the Department in the instant case was sufficient to satisfy R.C. Chapter 119 and R.C. 127.18, we must affirm the court of appeals in this regard.

II

As a second proposition of law, the appellants claim that the EBR erroneously admitted evidence obtained after the rule was promulgated. R.C. 3745.05, which provides for appeals of matters determined by the Director of the EPA to the EBR, reads in part:

"In hearing the appeal, if an adjudication hearing was conducted by the director of environmental protection in accordance with sections 119.09 and 119.10 of the Revised Code, the board is confined to the record as certified to it by the director. The board may grant a request for the admission of additional evidence when satisfied that such additional evidence is newly discovered and could not with reasonable diligence have been ascertained prior to the hearing before the director. If no adjudication hearing was conducted in accordance with sections 119.09 and 119.10 of the Revised Code, the board shall conduct a hearing de novo on the appeal."

This court, in *Union Camp Corp.* v. *Whitman* (1975), 42 Ohio St. 2d 441, 71 O.O. 2d 414, 329 N.E. 2d 690, held as syllabus law that:

"R.C. 3745.05 requires the En-

vironmental Board of Review to conduct a hearing *de novo* in an appeal from an order of the Director of Environmental Protection, except where such order results from an adjudication hearing conducted by the director in accordance with R.C. 119.09 and 119.10. (R.C. 3745.05, construed.)"

This same interpretation of this section of law was discussed in greater detail by the Tenth District Court of Appeals in the case of *U.S. Steel Corp.* v. *Williams* (1978), 61 Ohio App. 2d 155, 15 O.O. 3d 288, 400 N.E. 2d 1358.

The hearing conducted by the Director in this instance was for the promulgation of the rules applicable to the classification and water quality for the lower Cuyahoga segment, and was a rulemaking, or quasi-legislative hearing, and not an adjudication hearing. Therefore, in this instance R.C. 3745.05 requires that the appellate hearing before the EBR be conducted as a *de novo* hearing.

In conducting its *de novo* hearing pursuant to R.C. 3745.05, the EBR was not required to limit itself to the evidence which was available to the Director before the rule was promulgated. In a *de novo* hearing the EBR has a wide degree of latitude as to the evidence presented at the hearing. However, the EBR's findings and orders must be based upon the evidence adduced at the hearing before the EBR and the evidence within the record of the hearing before the Director.

The appellants argue that the EBR should not have considered the Director's post-promulgation evidence because the evidence had not been subject to public comment, which appellants argue is mandated by R.C. 119.03. In this regard we must agree with the court of appeals that although R.C. 119.03 requires a public hearing on a proposed agency rule for public comment thereon, it does not require a public hearing on all the data and evidence supportive of the rule. *Middletown* v. *Nichols* (1983), 9 Ohio App. 3d 135, 9 OBR 199, 458 N.E. 2d 886.

The holding of this court in *New Boston Coke Corp.* v. *Tyler* (1987), 32 Ohio St. 3d 216, 513 N.E. 2d 302, is not contrary to our conclusion here. *New Boston* merely held that a person must participate in the public comment phase of the rulemaking process if the person wishes to have standing to challenge the rule before the EBR.

In a review of this record, we conclude that the EBR did not erroneously admit the post-promulgation evidence submitted by the Director regarding the ability of the lower Cuyahoga segment to support the warmwater habitat classification.

### III

The EBR does not stand in place of the Director in considering an appeal, and may not substitute its judgment for that of the Director, but may consider only whether the Director's actions were unlawful or unreasonable, *Citizens Committee to Preserve Lake Logan* v. *Williams* (1977), 56 Ohio App. 2d 61, 10 O.O. 3d 91, 381 N.E. 2d 661. If, upon completion of the hearing, the EBR finds that the action appealed from was lawful and reasonable, it shall affirm the action. R.C. 3745.05.

The EBR heard the appeal of this matter for a period of one month. Upon conclusion of the hearing, the EBR issued a thirty-page order containing sixty-four findings of fact. The board found that the Director's order classifying the lower Cuyahoga segment was based upon a valid factual foundation which included evidence of the reasonableness of the chosen boundaries, and was therefore lawful and reasonable.

Upon an appeal to the Court of Appeals for Franklin County, that court is confined to the record as certified to it by the board unless that court grants a request for the admission of additional evidence. R.C. 3745.06. No additional evidence was permitted by the court of appeals in this matter. R.C. 3745.06 requires that the court of appeals affirm the order of the EBR "if it finds, upon consideration of the entire record and such additional evidence as the court has admitted, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law." The court of appeals, after a review of the trial record, found that the board had met the statutory standard, overruled all of the appellants' assignments of error, and affirmed the order of the EBR.

This court, upon a review of the totality of this record, affirms the court of appeals, and holds that the action of the Director in ordering the warmwater habitat classification for the lower Cuyahoga segment was lawful and supported by the evidence adduced in the record.

*Judgment affirmed.*

MOYER, C.J., SWEENEY, DOUGLAS and RESNICK, JJ., concur.

WRIGHT and H. BROWN, JJ., dissent.

WRIGHT, J., dissenting. Today the majority holds that the paramount objectives of R.C. Chapter 119 are to require full disclosure by rulemaking agencies when they propose rules and to provide parties interested in a proposed rule an adequate opportunity to be heard. With this I cannot argue. The majority then finds an incomplete disclosure to be complete. From this I dissent.

R.C. Chapter 119, Ohio's Administrative Procedure Act, provides a fixed unambiguous formula through which the General Assembly has granted legislative authority to the executive branch. The General Assembly has delegated this authority under the strict proviso that rulemaking agencies must follow the proper procedures:

"Every agency authorized by law to adopt, amend, or rescind rules shall comply with the procedure prescribed in sections 119.01 to 119.13, inclusive, of the Revised Code, for the adoption, amendment, or rescission of rules. Unless otherwise specifically provided by law, the failure of any agency to comply with such procedure shall invalidate any rule or amendment adopted, or the rescission of any rule." R.C. 119.02. See *McLean Trucking Co.* v. *Lindley* (1982), 70 Ohio St. 2d 106, 116, 24 O.O. 3d 187, 193, 435 N.E. 2d 414, 420; *Bd. of Trustees of Ohio State Univ.* v. *Dept. of Admin. Services* (1981), 68 Ohio St. 2d 149, 153-154, 22 O.O. 3d 383, 386-387, 429 N.E. 2d 428, 431-432.

The Ohio Environmental Protection Agency ("EPA") failed to comply with the requirements of R.C. Chapter 119. R.C. 119.03 requires that a fiscal analysis, as provided for in R.C. 127.18, accompany each copy of a proposed rule filed pursuant to R.C. Chapter 119. R.C. 127.18(E) requires the Joint Committee on Agency Rule Review ("JCARR") to provide the form on which the fiscal analysis is to be completed. R.C. 127.18(B) mandates seven inquiries that JCARR must include in the fiscal analysis form. The sixth inquiry requests "[a] summary of the estimated cost of compliance with the rule to all directly affected persons[.]" To this inquiry, the EPA responded: "Costs cannot be determined at this time. Waste-load allocation modeling must be performed

to determine whether more stringent water pollution controls will be required from the regulated community." In spite of this failure and R.C. 127.18(C)'s mandate that the fiscal analysis be "completely and accurately prepared," the majority found substantial compliance with R.C. Chapter 119.

The majority supports this holding by finding that JCARR has discretion to determine what constitutes a complete and accurate fiscal analysis. To support that proposition the majority cites R.C. 127.18(C): "* * *The joint committee on agency rule review *shall not* accept any proposed rule for filing unless a copy of the rule summary and fiscal analysis of the proposed rule, *completely and accurately prepared,* has been attached to each copy of the proposed rule." (Emphasis added.) This statutory provision vests no discretion with the EPA; it reads "shall," not "may."

The majority appears to reach the conclusion that JCARR has discretion in reviewing a fiscal analysis based upon JCARR's development of the fiscal analysis form and later use of the completed form. Although JCARR creates the form, the law requires that the form contain data concerning the economic impact on those persons directly affected by the proposed rule. R.C. 127.18(B)(6). Further, although JCARR uses the completed fiscal analysis in its review of a proposed rule, R.C. 119.03(B) requires that the fiscal analysis also be filed with the Secretary of State for public review and with the Legislative Service Commission for its use.

More troublesome than the majority's analysis is the majority's decision to afford the legislative veto provisions an import that the General Assembly expressly withheld. JCARR uses the fiscal analysis in determining whether to recommend a legislative veto. R.C. 119.03(I)(1)(d) provides that JCARR may recommend a concurrent resolution in the General Assembly to veto a proposed rule if the fiscal analysis is inaccurate or incomplete. R.C. 119.03 (I)(3) provides that the General Assembly's failure to veto a proposed rule does not validate the rule or the procedure by which the rule was promulgated. The majority today eliminates R.C. 119.03(I)(3) from the laws of Ohio in cases where JCARR does not act, regardless of what information is omitted from a fiscal analysis. This is most unfortunate. Presumably, if JCARR chooses not to require a fiscal analysis, a rulemaking agency need not file one at all.

By removing judicial review of the fiscal analysis, the majority has held in fact and effect that, in spite of its inclusion in R.C. 119.03, the fiscal analysis is not part of the procedure set forth in R.C. Chapter 119. Because I believe the legislature has expressed a clear intent to require rulemaking agencies to prepare a complete and accurate fiscal analysis that considers and documents the costs a proposed rule would impose on those directly affected by it, I dissent.

H. BROWN, J., concurs in the foregoing dissenting opinion.