OPINION
Appellant, Danis Clarkco Landfill Company ("Danis"), appeals from the final order of the Environmental Review Appeals Commission ("ERAC" or "the commission") vacating and remanding the action of the Director of the Environmental Protection Agency ("the Director, OEPA"), in which he issued a Permit to Install ("PTI") to Danis to construct a new solid waste disposal facility.
The appeal arises out of the proposal by Danis to construct a new solid waste disposal facility in Clark County, Ohio. Appellee, C.F./Water is a community organization whose membership includes individuals residing in the vicinity of the proposed solid waste facility, or landfill, who have questioned the Danis operations in the area. The proposed landfill site is five miles northwest of Springfield, Ohio, three-quarters of a mile northwest of Tremont City, Ohio, with most of the facility just south of the Clark County-Champaign County line. The facility would be located approximately one and one-quarter miles west of the Mad River.
The proposed facility is to be approximately one hundred twenty-five acres, with the proposed limits of solid waste placement, or landfill "footprint," to encompass approximately ninety acres. The expected life of the landfill is approximately thirty-seven years, based on anticipated average daily waste receipts of approximately 1,560 tons and authorized maximum daily waste receipts of 2,500 tons. If constructed, the landfill would be underlain with a double composite liner leachate collection system.
ERAC found that, in very general terms, the site presents eighty to one hundred thirty feet of till (an accumulation of stones, rocks, gravel and other debris carried and deposited by a glacier). Sand zones are interspersed throughout the till and, while not entirely contiguous, demonstrate a significant lateral extent of continuity or greater potential for movement. Under the till lies a layer of stratified drift, also a result of glacial presence, but comprised of more varied material which is less cohesive then the till layers. Below the drift lies bedrock.
Two significant aquifers exist below the proposed landfill: one in the stratified drift, the other in the bedrock. Pump tests confirmed that portions of the site overlay an aquifer capable of producing one hundred gallons of water per minute over a twenty-four hour period. Both aquifers supply water to the local community, and the bedrock aquifer is a regional aquifer that supplies the city of Springfield's wellfield. The aquifer in the drift, composed of sand and gravel, is referred to as the uppermost aquifer and lies just beneath the till. If the proposed landfill is constructed, a thirty foot layer of till would remain, functioning as a barrier to vertical movement of groundwater and contaminants to the aquifers.
Danis conducted an extensive investigation into the geology and hydrogeology of the area beneath the proposed site, submitting its initial application for the PTI to the Director in February 1992. The ability of the till to adequately protect the aquifers was an issue throughout the permit review process.
Ohio law prohibits placing a sanitary landfill above an unconsolidated aquifer that is capable of sustaining a yield of one hundred gallons per minute ("gpm") for a twenty-four hour period to an existing or future water supply well located within one thousand feet of the limits of solid waste placement of the sanitary landfill, unless the site is "deemed acceptable" by the Director. Ohio Adm. Code 3745-27-07(H)(2)(d). To receive a "deemed acceptable" waiver, an applicant must affirmatively demonstrate to the Director that the site is acceptable despite its presence over the aquifer.
Throughout the application process, the OEPA considered the site to be "marginal" for use as a landfill because of the one hundred gpm aquifer below the site, and the presence of sand zones above the aquifer. The OEPA review continued for several years, with Danis revising and supplementing its application several times to respond to questions and concerns posed by OEPA staff, German Township, and the city of Springfield. Ultimately, Danis' investigation included soil borings, pumping tests, hydraulic conductivity (or "slug") tests, and isotopic age-dating.
On February 9, 1996, the Director issued a PTI to Danis to install a solid waste disposal facility to be known as the Clarkco Landfill. The Director's decision to issue the permit was based on the factual determination that there were no "effective," (i.e., hydraulically active), fractures present that would provide a direct pathway to the one hundred gpm aquifer. If hydraulically active fractures were present in the till, the permit would not have been granted.
C.F./Water appealed the issuance of the PTI. The board of trustees of German Township filed a motion to intervene which was granted by the commission on November 26, 1996.
The commission held a de novo hearing beginning on October 14, 1997, and continuing through October 21, 1997. The hearing was reconvened on January 20, 1998, and concluded on January 27, 1998.
At the de novo hearing, the commission considered evidence of matters that occurred after the issuance of the PTI. See Northeast Ohio Regional Sewer Dist. v. Shank (1991), 58 Ohio St.3d 16
(at de novo hearing, commission not limited to evidence available to the Director at the time of his decision). Specifically, the commission found that when the OEPA's primary reviewer, Steven Lowry, recommended that the permit be granted, Lowry was unaware that boring logs C91-8D (drilled on June 25, 1991) and 92-15X (drilled on May 26, 1992) documented the presence of fractures in the till. A number of other logs documented geologically descriptive terms suggestive of fractures. Lowry also testified that he had not reviewed the boring logs as part of his review or prior to making his recommendation, but that he assumed that Brian Nickel, his predecessor at OEPA, had reviewed the logs.
Based on the certified record and the evidence presented at the de novo hearing, the commission found the Director's action in issuing the solid waste PTI to be unreasonable and remanded the cases to the Director to "conduct an appropriate investigation into the application in light of the undisputed presence of fractures in the till overlying the aquifers." (Findings of Fact and final order at 25.)
Danis appealed, assigning as error the following:
 The order of the Environmental Review Appeals Commission vacating and remanding the Director of the Environmental Protection Agency's final action in issuing to Appellant Clarkco Landfill Company a permit to install a solid waste landfill facility, is in error because the Director's issuance of the permit was based upon a substantial and valid factual foundation, and was otherwise lawful and reasonable.
R.C. 3745.05 defines the scope of ERAC's powers in reviewing an action of the Director:
 If, upon completion of the hearing, the commission finds that the action appealed from was lawful and reasonable, it shall make a written order affirming the action, if the commission finds that the action was unreasonable or unlawful, it shall make a written order vacating or modifying the action appealed from.
ERAC does not stand in the place of the Director on appeal and may not substitute its judgment for that of the Director as to factual determinations. Citizens Committee v.Williams (1977), 56 Ohio App.2d 61, 69. Thus, in reviewing a decision of the Director, ERAC is limited to considering whether the Director's action was unreasonable or unlawful given the evidence presented at the de novo hearing. Red Hill Farm Trust v.Schregardus (1995), 102 Ohio App.3d 90, 95.
"Unlawful" means that which is not in accordance with law, and "unreasonable" means that which is not in accordance with reason, or that which has no factual foundation. CitizensCommittee, supra, at 70. "It is only where the board can properly find from the evidence that there is no valid factual foundation for the Director's action that such action can be found to be unreasonable. Accordingly, the ultimate factual issue to be determined by the board upon the de novo hearing is whether there is a valid factual foundation for the Director's action and not whether the Director's action is the best or most appropriate action, nor whether the board would have taken the same action."Id.
On an appeal to this court and based on consideration of the entire record, we must affirm if ERAC's decision that the Director's action was unreasonable is supported by reliable, probative and substantial evidence and is in accordance with law. See R.C. 3745.06.
As in Citizens Committee, supra, at 69, the factual issue before ERAC was not whether the permit should have been granted; rather, the factual issue was whether the action of the Director in granting the permit was unreasonable or unlawful. If the factual basis for a particular decision is found to be invalid or no longer exists, then the action of the Director stemming from that invalid basis may be invalid. Swan Super Cleaners, Inc. v.Tyler (1988), 48 Ohio App.3d 215, 220.
Danis argues that the commission failed to defer to the technical and scientific judgments of the Director. Danis characterizes the de novo hearing as a "battle of the experts" in which the commission improperly assumed the role of a technical review panel by weighing the various scientific opinions and improperly substituting C.F./Water's expert's opinion for that of the Director.
Danis further argues that the commission substituted its judgment for that of the Director in two ways. First, Danis contends ERAC failed to defer to the Director's determination that there were no hydraulically active fractures beneath the till. Second, Danis argues that the commission failed to defer to the Director's determination as to what tests were necessary to investigate whether the site should be deemed acceptable.
Contrary to appellant's position, ERAC did not state or imply that it found C.F./Water's expert more credible than Danis' or the Director's witnesses. Rather, ERAC considered the geologic and hydrologic evidence in the context of deciding whether the Director acted lawfully and reasonably in granting the permit.
ERAC considered the testimony of the OEPA witnesses who were unaware of the presence of fractures in boring samples. ERAC had before it testimony from OEPA's own witness that, had he and the agency been aware of the presence of fractures in the boring logs, the facility would have failed the "time of travel" calculation (Taliferro at 1058)[1] and Danis would not have qualified for the "deemed acceptable" determination.
There was evidence from OEPA witnesses and Danis witnesses at the de novo hearing that at least some of the five bases relied upon in making the no effective fractures determination were themselves not based on a valid factual foundation. First, there was evidence that the boring logs were not reviewed prior to the recommendation. Second, the OEPA admitted that the seventy-two hour pump test was not an appropriate test for determining the presence of hydraulically active fractures. Therefore, the pump test no longer provided a basis for concurring with the "deemed acceptable" determination. (Taliaferro at 1101-1103.) Third, Danis' own expert, Herb Eagon, acknowledged that the slug tests were of questionable value in determining vertical hydraulic conductivity. Steve Lowry also acknowledged that he could not conclude there were no fractures at the site based on the results of the slug tests. (Tr. 973-974.) Fourth, OEPA witnesses and Danis' expert conceded that the presence of a confined saturated sand zone above an unsaturated zone did not lead to the conclusion that no hydraulically active fractures exist at the site.
This leaves the fifth basis, the isotope testing, as the only remaining basis upon which to base the "deemed acceptable" determination. Danis' experts acknowledged the limitations of isotope testing. OEPA witnesses indicated that isotope testing, standing alone, would not provide an adequate basis for the "deemed acceptable" determination.
Finally, at the time the Director deemed the site acceptable, the agency was of the opinion that the issue of hydraulically active fractures had been fully investigated. However, once OEPA had realized that the boring logs indicated the presence of fracture in the till, OEPA failed to conduct any additional testing or recalculations.
Based upon the totality of the evidence, the commission determined that the PTI was granted based upon OEPA's conclusion that the lower till was unweathered and unfractured (no hydraulically active or effective fractures) and, therefore, capable of preventing leachate from migrating within the time required by the guidelines. ERAC found the foundation for the Director's decision to be resting on an invalid factual foundation. Ultimately, the commission remanded the matter to the Director to reevaluate the application in light of evidence that was overlooked in the initial permit review process.
Based on our review of the record, and in particular the evidence presented at the de novo hearing, we conclude that there was reliable, probative and substantial evidence to support ERAC's decision that the Director's action was based upon an invalid factual foundation. Accordingly, we overrule the single assignment of error and affirm the order of the Environmental Review Appeals Commission.
Judgment affirmed.
DESHLER and TYACK, JJ., concur.
[1] Ohio Adm. Code 3745-27-07(H)(3)(a) prohibits siting a landfill within the surface and subsurface areas surrounding a public water supply well through which contaminants may move toward and may reach the public water supply within a period of five years.