SAVE THE LAKE, et al., Appellants,

v.

SCHREGARDUS, Dir., et al., Appellees.

[Cite as *Save the Lake v. Schregardus* (2001), 141 Ohio App.3d 530.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

Nos. 00AP–532, 00AP–533.

Decided Feb. 27, 2001.

---

1. *In re Adoption of Bovett* (1987), 33 Ohio St.3d 102, 515 N.E.2d 919.

2. *In re Adoption of Jordan* (1991), 72 Ohio App.3d 638, 595 N.E.2d 963.

John B. Huber; J. Dwight Poffenberger, Jr., for appellants.

*Manley, Burke & Lipton* and *Timothy M. Burke,* for *amicus curiae* Rivers Unlimited, Inc.

*Betty D. Montgomery,* Attorney General, *Robert J. Karl* and *Sheila O'Brien–Firack,* Assistant Attorneys General, for appellee Director of Ohio Environmental Protection Agency.

*Rocky Coss,* for appellee Highland County Commissioners.

---

LAZARUS, Judge.

Appellants, Save the Lake, an Ohio nonprofit corporation, and numerous residents of Hillsboro, Ohio, appeal from the April 13, 2000 findings of fact, conclusions of law, and final order issued by the Environmental Review Appeals Commission ("ERAC"). Appellants are appealing the decision of ERAC that appellee the Director of Ohio Environmental Protection Agency's issuance of two permits authorizing construction of a wastewater treatment project at Rocky Fork Lake was reasonable and lawful. The permits at issue are a permit to install ("PTI"), issued January 27, 1998, and a National Pollution Discharge Elimination System ("NPDES") permit issued May 1, 1998, to appellee, Highland County Commissioners.

Rocky Fork Lake is a 2,080-acre man-made body of water located in Highland County. The lake was created in 1952 and has undergone both residential and recreational development since then. The Ohio Department of Natural Resources operates a state park at the lake. The area has been unsewered, and individual on-site septic systems or package plants have served the lake area. Those systems had generally begun to fail and to negatively impact the quality of the life of local residents, as well as the quality of the lake and its beaches.

The Ohio Environmental Protection Agency ("EPA") received a number of complaints regarding unsanitary conditions at the lake and consequently initiated an investigation. In late 1993, the Ohio EPA began discussions with the Highland County Commissioners regarding ways in which the unsanitary conditions might be alleviated. The Ohio EPA prepared draft orders instructing the commissioners to submit a plan for abating the pollution. The commissioners, however, refused to sign the orders and, instead, determined to address the pollution by establishing a county sewer district pursuant to R.C. Chapter 6117. They then retained the services of the engineering firm of Design Enterprises, Ltd., to develop plans to alleviate the problem.

The commissioners, in concert with Design Enterprises, submitted a proposal to the Ohio EPA in March 1994. This plan offered four site options for the wastewater treatment plant, as well as a number of treatment options including three types of collection systems and eleven types of treatment methods. The

Ohio EPA did not approve the county's preferred treatment option because it was considered experimental technology in Ohio.

Eventually, the county chose a "direct continuous discharge" system that provided for the discharge of treated effluent to the Rocky Fork Creek. This option necessitated an antidegradation review pursuant to the antidegradation provisions of Ohio law and the Clean Water Act. In January 1996, the county officially submitted an application for a PTI and an NPDES permit to construct the collection system and wastewater treatment plant. The Ohio EPA approved those applications and issued permits in September 1996. The permits were rescinded in April 1997, due to a failure to comply with the public notice requirements. On May 1, 1997, the Highland County Commissioners submitted an antidegradation addendum for the project, and the process began anew. The Director issued a new PTI on January 27, 1998, and a new NPDES permit on May 1, 1998.

Appellants, primarily homeowners and residents located in the Rocky Fork Lake region of Highland County, appealed the Director's issuance of both the PTI and NPDES permit to ERAC. ERAC consolidated the appeals and dismissed a number of appellants' assignments of error. A *de novo* hearing was held on the remaining assignments of error.

On April 12, 2000, ERAC issued findings of fact, conclusions of law, and a final order affirming the Director's decisions. On May 11, 2000, appellants filed their notice of appeal assigning as error the following:

"ASSIGNMENT OF ERROR No. 1

"The Environmental Review Appeals Commission erred in applying the October 1, 1996 Amendments to Ohio's Antidegradation Rule to the permit applications which had been filed prior to October 1, 1996 and further erred in determining that those amendments were effective prior to and in the absence of final approval by the U.S. EPA. The ERAC further erred in omitting to construe the applicable version of Ohio's Antidegradation Rule consistently with the Clean Water Act and in finding that the Director had complied with the Ohio Antidegradation Rule in the issuance of the PTI and NPDES Permits.

"ASSIGNMENT OF ERROR No. 2

"The Environmental Review Appeals Commission erred in affirming the lawfulness of the issuance of the PTI and NPDES permits in the face of admissions by the Director that he had complained to himself, and had proceeded without a prior initiating complaint by any local jurisdiction.

"ASSIGNMENT OF ERROR No. 3

"The Environmental Review Appeals Commission erred in affirming the issuance of the PTI and NPDES permits allowing a lowering of water quality without prior notice, hearing, and meaningful public participation, and in the absence of appropriate intergovernmental coordination, all as required by the Ohio Antidegradation Rule in conformance with federal water quality standards. While under a duty to take affirmative steps to inform the public concerning pertinent issues, the Applicant instead waged an affirmative campaign of misinformation which [misled] the public.

"ASSIGNMENT OF ERROR No. 4

"A. The Environmental Review Appeals Commission erred in approving the Director's application of a balancing test, weighing the extent of degradation against the extent of the prospect for development, and erred in approving the Director's determination of a necessity to degrade in the face of tacit admissions by the Applicant and by the representatives of the Director that no important development would result.

"B. The Commission further erred as a matter of law in affirming the Director's and the Applicants' omissions to take reasonable steps to investigate regional sewage treatment needs and alternatives, which investigation was essential to any assessment of important development gains in this lake region.

"ASSIGNMENT OF ERROR No. 5

"The Environmental Review Appeals Commission erred in dismissing portions of Appellants' appeal for lack of jurisdiction, and in so doing, wrongly abandoned its broad de novo jurisdiction over environmental protection. On grounds that the Commission was without specific authority to enforce FAA and Dept. of Transportation laws and regulations, it refused to accept evidence of the land use separation standards, set out in those regulations, and refused to accept evidence of the broad body of recognized scientific and technical data which underlies FAA and ODOT land use regulations and separation standards.

"ASSIGNMENT OF ERROR No. 6

"The Environmental Review Appeals Commission wrongly imposed the burden of proof on the Appellants, and in so doing, failed to ensure that existing recreational uses within the Rocky Fork State Park would be fully protected. The Commission erred as a matter of law by affirming the Director's issuance of the permits which would allow degradation of outstanding national resource waters.

"ASSIGNMENT OF ERROR No. 7

"The ERAC erred in approving the rejection by the applicant and the Director of all zero discharge options based on costs, and moreover based on the inability

of this particular service area with a large percentage of low and middle income residents to absorb the higher costs of zero discharge options."

Additionally, *amicus curiae*, Rivers Unlimited, Inc., submitted the following two "Propositions of Law," which we shall address within the context of appellants' assignments of error:

"PROPOSITION OF LAW NO. 1

"The issuance of permits by the Director of the Ohio Environmental Protection Agency which impacts on the waters of state parks must not degrade the quality of the waters.

"PROPOSITION OF LAW NO. 2

"The correct standard of law for the Environmental Review Commission to apply in deciding whether the issuance of the two permits were lawful and reasonable is the first version of the Ohio Antidegradation Rule enacted in 1985."

R.C. 3745.05 defines the scope of ERAC's powers in reviewing an action of the Director:

"If, upon completion of the hearing, the commission finds that the action appealed from was lawful and reasonable, it shall make a written order affirming the action, if the commission finds that the action was unreasonable or unlawful, it shall make a written order vacating or modifying the action appealed from. * * *"

ERAC does not stand in the place of the Director on appeal and may not substitute its judgment for that of the Director as to factual determinations. *Northeast Ohio Regional Sewer Dist. v. Shank* (1991), 58 Ohio St.3d 16, 26, 567 N.E.2d 993, 1002–1003; *Citizens Commt. v. Williams* (1977), 56 Ohio App.2d 61, 69, 10 O.O.3d 91, 96, 381 N.E.2d 661, 666. Thus, in reviewing a decision of the Director, ERAC is limited to considering whether the Director's action was unreasonable or unlawful given the evidence presented at the *de novo* hearing. *Northeast Regional, supra*, at 24, 567 N.E.2d at 1000–1001; *Red Hill Farm Trust v. Schregardus* (1995), 102 Ohio App.3d 90, 95, 656 N.E.2d 1010, 1012–1013; *CECOS Internatl., Inc. v. Shank* (1992), 79 Ohio App.3d 1, 6, 606 N.E.2d 973, 976–977.

"Unlawful" means that which is not in accordance with law, and "unreasonable" means that which is not in accordance with reason, or that which has no factual foundation. *Citizens Committee, supra*, at 70, 10 O.O.3d at 96–97, 381 N.E.2d at 666–667. "It is only where the board can properly find from the evidence that there is no valid factual foundation for the Director's action that such action can be found to be unreasonable. Accordingly, the ultimate factual issue to be determined by the board upon the *de novo* hearing is whether there is

a valid factual foundation for the Director's action and not whether the Director's action is the best or most appropriate action, nor whether the board would have taken the same action." *Id.*

On an appeal to this court, and based on consideration of the entire record, we must affirm if ERAC's decision that the Director's action was reasonable is supported by reliable, probative, and substantial evidence and is in accordance with law. See R.C. 3745.06. As in *Citizens Committee, supra,* at 69, 10 O.O.3d at 96, 381 N.E.2d at 666, the issue before ERAC was not whether the permits should have been granted; rather, the issue in this case is whether the action of the Director in granting the permits was unreasonable or unlawful.

In their first assignment of error, appellants argue that ERAC applied the wrong version of Ohio's Antidegradation Rule in deciding whether the issuance of the permits was lawful and reasonable. Appellants and Rivers Unlimited take the position that ERAC and the Director should have applied the version of Ohio Adm.Code 3745–1–05, with an effective date of April 4, 1985, to this case, rather than applying the version of Ohio's Antidegradation Rule, Ohio Adm.Code 3745–1–05, adopted on October 1, 1996. Moreover, regardless of which version of the rule applies, appellants contend that the Director's issuance of the permits did not comply with either the 1985 version or the 1996 version of the Ohio Antidegradation Rule. We address each of these arguments in turn.

First, appellants argue that the law in effect at the time the applications were originally submitted should apply rather than the law in effect at the time the application is reviewed. Thus, appellants contend that, because the Highland County Commissioners' applications were originally submitted prior to October 1, 1996, the Director and ERAC should have applied the version of the Ohio Antidegradation Rule effective prior to that date, the 1985 version.

We find this argument unpersuasive for several reasons. Appellants cite *Gibson v. Oberlin* (1960), 171 Ohio St. 1, 12 O.O.2d 1, 167 N.E.2d 651, in support of the proposition that the law in effect when an application is filed governs the issuance of a permit. In *Gibson,* the appellant had applied for a building permit to which he was clearly entitled. The city had refused to grant the permit and, instead, while the appellant's application for a permit was pending, instituted a change in the zoning law that made it impossible for the appellant to comply with the requirements for a permit. The court declared that the city's action amounted to an unconstitutional retroactive application of a new ordinance, and ordered that the permit should be granted in accordance with the law in effect at the time of the application. The court also held that "[t]he ability to establish a nonconforming use constitutes a valuable right," and that "[t]he right became vested, under the law applicable thereto, upon the filing of the application for the

permit." *Id.* at 3, 6, 12 O.O.2d at 2, 3, 167 N.E.2d at 652, 654. Thus, the Supreme Court of Ohio reaffirmed the notion that a municipality may not give retroactive effect to an ordinance in order to deprive a property owner of a substantial right.

■ *Gibson* is inapposite to the instant case, however, because the Highland County Commissioners did not acquire a vested or substantial right at any time prior to the adoption of the October 1, 1996 antidegradation rule. Ohio case law indicates that an applicant does not acquire a vested right simply by applying for a permit. In *Scharff v. State Bd. of Liquor Control* (1955), 99 Ohio App. 139, 142, 58 O.O. 251, 252–253, 131 N.E.2d 844, 845, this court held that there is no vested right in an application for a liquor permit and, therefore, the law in effect at the time of passing on the permit, rather than on the date of filing the application, governed the applicant's right to a permit.

Finally, while it is true the applications were *originally* submitted before October 1, 1996, and a PTI and an NPDES permit were issued in 1996, those permits were subsequently revoked in April 1997, due to a failure to comply with the public notice requirements. Moreover, Highland County has never argued that it acquired a vested right by virtue of the improperly issued permits.

On May 1, 1997, the Highland County Commissioners submitted an antidegradation addendum for the project, and the process began anew. According to Beth Bailik, who reviewed the applications at this point, the Highland County Commissioners' proposal was " 'treated just like any other new submittal.' " (Findings of Fact No. 27.) Thus, even if the law in effect at the time of the filing of an application somehow controlled, a new application was made after the October 1, 1996 Ohio Antidegradation Rule went into effect.

■ Appellants next argue that neither the 1996 version of the antidegradation rule nor any subsequent amendments submitted after 1985 have been formally approved by the United States EPA and, therefore, are not effective. Because the United States EPA has enacted a grandfather provision approving Ohio's Antidegradation Rule, we disagree.

Section 303(c) of the Clean Water Act requires states to review their water quality standards periodically, to adopt new or revised standards as needed, and to submit their standards for United States EPA review. Section 303(c)(3) states that "[i]f the Administrator, within sixty days after the date of submission of the revised or new standard, determines that such standard meets the requirements of this chapter, such standard shall *thereafter* be the water quality standard for the applicable waters of that State." (Emphasis added.) Section 1313(c)(3), Title 33, U.S.Code. It is undisputed that, at the time ERAC considered the issuance of the permits, the United States EPA had never formally approved the October 1,

1996 version of the antidegradation rule, although informal approval had been given.

Notwithstanding this statutory language, the United States EPA's water quality regulations set out an interpretation of the Act that allowed state standards to go into effect for Clean Water Act purposes as soon as they were adopted and effective under state law, and to remain in effect unless and until replaced by another standard. Section 131.21(C), Title 40, C.F.R., 65 F.R. 24642. Nonprofit environmental groups challenged this interpretation and, on July 8, 1997, a federal district court issued an opinion in *Alaska Clean Water Alliance v. Clarke* (July 8, 1997), W.D.Wash. No. C96–1762R, unreported, 1997 WL 446499, holding that the plain meaning of the Clean Water Act was that the new and revised state water quality standards were not effective until approved by the United States EPA. The parties to the lawsuit entered into a settlement agreement under which the United States EPA agreed to propose revisions to Section 131.21(C), Title 40, C.F.R., 65 F.R. 24642.

Subsequently, on April 27, 2000, the United States EPA promulgated a rule that included a grandfather provision allowing state standards that had gone into effect prior to the effective date of the new rule and that had not been approved by the United States EPA to be used for Clean Water Act purposes. In part, the adoption of this rule was due to the fact that interested parties had relied on the old rule. *Id.* at 65 F.R. 24645. According to the new rule, state standards adopted prior to the effective date of the new rule are the applicable water quality standards for purposes of the Clean Water Act and remains so unless or until they are superseded by more stringent standards approved or promulgated by the United States EPA. *Id.* at 65 F.R. 24642, 24645–24647, 24653.

The effect of the settlement agreement and resulting grandfather provision is that the newer antidegradation rule became effective for Clean Water Act purposes when it was adopted by the state of Ohio. Thus, the Director and ERAC did not contravene federal law by applying the antidegradation rule in effect at the time it issued the permits. Therefore, we decline to address appellants' arguments that the issuance of the permits violated the 1985 version of Ohio Adm.Code 3745–1–05.

■ Appellants further argue that, even applying the 1996 version of Ohio Adm.Code 3745–1–05, the issuance of the permits was unlawful. Appellants contend that the waters of Rocky Fork Lake and Rocky Fork Creek are high quality waters constituting outstanding national resource waters ("ONRW") and entitled to the highest possible protection under federal law. Appellants contend that, because Rocky Fork Lake and a portion of Rocky Fork Creek are in a state park, as a matter of law, they must automatically be classified as ONRW under

Section 131.12(a)(3), Title 40, C.F.R., and may not be degraded at all. We disagree.

Federal law requires states to adopt a statewide antidegradation policy consistent with federal regulations that protects high quality waters. *Columbus & Franklin Cty. Metro. Park Dist. v. Shank* (1992), 65 Ohio St.3d 86, 97, 600 N.E.2d 1042, 1052–1053. The Ohio Antidegradation Policy is required by federal law and state law to conform to federal water quality standards. *Id.* at 100, 600 N.E.2d at 1054–1055. Section 131.6, Title 40, C.F.R., entitled "Minimum requirements for water quality standards submission," states that an antidegradation policy consistent with Section 131.12, Title 40, C.F.R., must be included in each state's water quality standards submitted to the United States EPA for review. Accordingly, the state water quality standards must include an antidegradation policy to ensure that "[e]xisting instream water uses and the level of water quality necessary to protect [those] existing uses [are] maintained and protected." Section 131.12(a)(1), Title 40, C.F.R.

Appellants contend that the 1996 version of the antidegradation rule is inconsistent with Section 131.12(a), Title 40, C.F.R., and, therefore, invalid because it does not adequately protect ONRW such as Rocky Fork Lake State Park. Section 131.12, Title 40, C.F.R., identifies the necessary requirements of state antidegradation policy and is broken down into three components, or tiers. The first tier, Tier 1, sets forth the minimum standards which states must maintain for all water uses and the level of water quality necessary to protect those uses. Section 131.12(a)(1), Title 40, C.F.R. The second tier, Tier 2, requires a higher quality of protection and applied to waters whose quality exceeds Tier 1 levels. Tier 2 requires states to maintain and protect a level of water quality "necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water," unless the state finds that lowering the water quality is "necessary to accommodate important economic or social development in the area." Section 131.12(a)(2), Title 40, C.F.R.

Finally, Tier 3, Outstanding National Resource Waters, represents the most protective of the antidegradation designations. Section 131.12(a)(3), Title 40, C.F.R. provides:

"(a) The State shall develop and adopt a statewide antidegradation policy and identify the methods for implementing such policy pursuant to this subpart. The antidegradation policy and implementation methods shall, at a minimum, be consistent with the following:

"* * *

"*(3) Where high quality waters constitute an outstanding National resource, such as waters of National and State parks and wildlife refuges and waters of*

*exceptional recreational or ecological significance, that water quality shall be maintained and protected."* (Emphasis added.)

As one commentator has noted: "The federal antidegradation policy, however, provides little assistance to the states in defining the parameters of this designation." "Antidegradation: A Lost Cause or the Next Cause" (Summer, 1999), 2 U. Den. Water L. Rev. 189, 195. Thus, Section 131.12(a)(3), Title 40, C.F.R., sets forth examples of waters that could be classified as ONRW, but we do not read the regulation as automatically classifying all waters in all state parks as ONRW.

Ohio's antidegradation scheme defines ONRW as "surface waters that have a national ecological or recreational significance, and that have been so designated pursuant to paragraph (E) of this rule." Ohio Adm.Code 3745–1–05(A)(9)(d). Under Ohio's antidegradation scheme, neither Rocky Fork Lake nor Rocky Fork Creek has been designated as ONRW. In fact, Rocky Fork Lake is classified as "state resource waters" under Ohio Adm.Code 3745–1–05(E)(1)(b), and the relevant segment of Rocky Fork Creek is classified as an "exceptional warm water habitat" and "state resource water" under Ohio Adm.Code 3745–1–09. These classifications are not inconsistent with the classification scheme envisioned by the Clean Water Act. Therefore, appellants' argument that issuance of the permits was unlawful because the state classification scheme conflicts with Section 131.12, Title 40, C.F.R., is without merit. The first assignment of error is not well taken.

 In their second assignment of error, appellants contend that issuance of the permits was unlawful because the Director was without legal authority absent a complaint from a local entity to initiate action under R.C. 6117.34. Absent such an initiating complaint from a local government authority, appellants contend that the Director's authority is limited to enforcement of existing laws against offending property owners. Appellants also contend that the Director "coerced" the Highland County Commissioners to take action.

Appellants note that R.C. 6117.34 allows the Director to inquire into and investigate unsanitary conditions and order the construction of facilities if a legislative authority or board of health makes a complaint in writing to the EPA that unsanitary conditions exist. Appellants contend that, in order to avoid enforcing state and local laws against individual homeowners for septic violations and in order to avoid enforcement actions against the Ohio Department of Natural Resources for unlawful discharges from their package plants, the Director threatened the county by means of the draft orders without any written complaint as required by R.C. 6117.34.

The evidence presented at the *de novo* hearing belies these contentions. R.C. 6111.05 authorizes the Director on his own or upon written complaint by a person

to initiate investigations into acts of pollution of state waters. The evidence before ERAC was that the Ohio EPA had received complaints from residents as early as spring of 1993 about unsanitary conditions in and around Rocky Fork Lake. After investigation, it was apparent that repair of failing septic systems of individual lot owners was not feasible.

Consequently, the Ohio EPA began discussions with the Highland County Commissioners regarding ways in which these unsanitary conditions might be alleviated. In August 1993, the Ohio EPA wrote a letter to the Highland County Commissioners explaining that "[w]hile Ohio EPA has the option (and the authority under ORC 6111 and 6117) to issue orders to County Commissioners in situations such as these, this step may not be needed if timely progress can be made." (Exhibit S1, appendix 1.) Rather than coercion, the evidence presented showed ongoing dialog and negotiations between the Ohio EPA and the Highland County Commissioners. According to Highland County Commissioner Russell L. Newman, the commissioners had many "negative conversations" with the Ohio EPA, because the state would not shoulder its fair share of the burden.

The Director then presented draft orders to Highland County that stated that "[p]ursuant to Ohio Revised Code (ORC) Chapter 6111 and Sections 6117.34 and 3745.01" the Ohio EPA was requiring Highland County to abate the pollution and remedy the unsanitary conditions. (Record S1–115.) Ultimately, the commissioners refused to sign the draft orders to abate the pollution. The Ohio EPA never issued the orders in final form because the commissioners, on their own initiative, determined to address the pollution.

Appellants' argument that the Director could not act unless a local jurisdiction complained to him is without merit. The Ohio EPA, pursuant to R.C. 6111.03(H)(1) and (2), has the power to:

"(H) Issue, modify, or revoke orders to prevent, control, or abate water pollution by such means as the following:

"(1) Prohibiting or abating discharges of sewage, industrial waste, or other wastes into the waters of the state;

"(2) Requiring the construction of new disposal systems or any parts thereof, or the modification, extension, or alteration of existing disposal systems or any parts thereof[.]"

The Director clearly had the authority to take action and initiate discussion with the Highland County Commissioners to alleviate the unsanitary conditions at Rocky Fork Lake. The second assignment of error is not well taken.

In their third assignment of error, appellants contend that the issuance of the permits was unlawful because of lack of notice, improper conduct of the

hearing, lack of meaningful public participation, and lack of intergovernmental coordination. First, appellants argue that the notice of the antidegradation hearing was flawed in that it failed on its face to identify the subject matter of the hearing and, thus, was insufficient to encourage public participation as required by Section 25.3, Title 40, C.F.R. Second, appellants argue that the hearing was conducted improperly. Third, appellants argue that there was insufficient advance notice of the change of the meeting place. Fourth, appellants argue that the public did not have sixty days to review and inspect the application. And fifth, appellants argue that the Director failed to give true notice by mail of the antidegradation hearing to persons required to be notified. We shall address each of these arguments in turn.

Ohio Adm.Code 3745–1–05(C)(3) sets forth how the Director is to issue public notices regarding potential degradation to waters of the state. This regulation states:

"The director shall provide for public participation and intergovernmental coordination prior to taking action * * * using the provisions of this paragraph.

"(a) The director shall publish a public notice within thirty days regarding receipt of any permit to install application, national pollutant discharge elimination system permit application * * *. The purpose of such notice shall be to inform other potentially affected persons, to allow for inspection and review of the application, to indicate whether any of the exclusions or waivers described in paragraph (D) of this rule apply, to instruct people to contact the director within thirty days, if they want to be on the interested parties mailing list for that application, to advertise the date, time and place of any public hearing required under paragraph (C)(3)(c) of this rule, and, on general high quality waters and limited quality waters, to determine whether there is interest in having a public hearing.

"All notices of hearings required by paragraph (C)(3)(c) of this rule shall be published once in a newspaper having general circulation in the county where the source, activity or facility is located. The notice shall be published at least forty-five days before the hearing. Notices shall also be sent by first class mail to all persons on the mailing list created pursuant to paragraph (C)(3)(b) of this rule.

"(b) The director shall develop and maintain a list of persons and organizations who have expressed an interest in or may, by the nature of their purposes, activities or members, be affected by or have an interest in antidegradation reviews."

The April 16, 1997 public notice issued by the Ohio EPA for the June 3, 1997 antidegradation hearing, complied with the above-cited rule and provided ample notice to the public. The record is clear that the meeting was publicized as an

antidegradation hearing, that appellants knew that it was an antidegradation hearing, and that they understood what the term meant. (See Findings of Fact No. 40.)

Appellants claim that the meeting handouts and remarks from the hearing officer confused and misdirected unrepresented citizens from making relevant comments. A review of the record reveals that this allegation is unsupported. Appellants and concerned citizens knew the purpose of the hearing, wrote letters, and presented relevant testimony.

Appellants argue that the change in location violated the forty-five-day notice provision contained in Ohio Adm.Code 3745–1–05(C)(3)(a). This argument is specious. Appellants themselves requested that the meeting location be changed to accommodate larger attendance. After a new location was found, the Ohio EPA sent out several notices by mail, contacted the attorney for appellants, and issued two public notices in the local newspaper informing the public of the changed location. On the day of the hearing, a large sign was left at the original site notifying the public of the new site, which was less than a mile away. Appellants cannot now argue in good faith that the Ohio EPA's efforts to accommodate their request were prejudicial error. Moreover, construing the notices together, it is clear that the Ohio EPA complied with the notice requirement.

Appellants argue that they are entitled to a sixty-day review and inspection period before the antidegradation hearing. Appellants have not cited to any rule or law that provides such a requirement.

Appellants argue that the Director failed to provide true notice by mail of any antidegradation hearing to persons on the project mailing list. Appellants seem to argue that the notices they received were defective because they did not adequately inform them of the hearing. This argument is belied by the facts in the record. The record shows that the Ohio EPA created an interested-parties mailing pursuant to Ohio Adm.Code 3745–1–05(C) and mailed the required notices to the entities and persons needed to comply with the public participation and intergovernmental coordination process.

Also under this assignment of error, appellants argue that the Ohio EPA permitted consideration of the permits in advance of any decision on antidegradation. We disagree. Application for the PTI and NPDES triggered the antidegradation process. An antidegradation public hearing was held on June 3, 1997. The public hearing on the PTI application was held in October 1997. Appellants' argument is without merit.

Appellants argue that the Ohio EPA erred in not placing project documents for review and inspection in the local library instead of the district office in Dayton. There is no such legal requirement. Appellants' argument is without merit.

Appellants argue that the Highland County Commissioners failed to involve other governmental agencies or officials in the proposed project. The intergovernmental coordination requirement is mandatory for the Ohio EPA, not the county commissioners. Ohio Adm.Code 3745–1–05(C)(3)(f). As discussed above, the Ohio EPA did compile and maintain an interested-parties database. The argument is without merit.

Appellants argue that the Highland County Commissioners affirmatively misled the public and attempted to stifle public participation which led to the failure to develop broad public support for the proposed alternative. Even if true, these allegations appear to be matters that are outside the ERAC appeals process and are not germane to the decision of whether the Director's action was unreasonable or unlawful given the evidence presented at the *de novo* hearing. *Red Hill Farm Trust, supra,* at 95, 656 N.E.2d at 1012–1013. The third assignment of error is not well taken.

██ In their fourth assignment of error, appellants essentially argue that the evidence does not support social and economic justification for the Director's decision to issue the permits. Appellants contend that the Director should first have determined if degradation were necessary. Only then should he have balanced the anticipated social and economic benefits of the proposed system against the amount of the proposed degradation. Appellants also claim that the Director and Highland County failed to investigate zero discharge and regional alternatives.

Ohio Adm.Code 3745–1–05(C)(6) provides in part:

"The director may approve activities that lower water quality only if there has been an examination of non-degradation, minimal degradation and mitigative technique alternatives, a review of the social and economic issues related to the activity, a public participation process and appropriate intergovernmental coordination, and the director determines that the lower water quality is necessary to accommodate important social or economic development in the area in which the water body is located."

██ When making determinations regarding proposed activities that lower water quality, the Director must consider thirteen factors, including the cost-effectiveness and technical feasibility of nondegradation alternatives, the reliability of the preferred alternative, and the condition of the local economy. Ohio Adm.Code 3745–1–05(C)(6)(a) through (m). The Ohio EPA issued a social-

economic justification report on August 5, 1997 and September 8, 1997, which was admitted as an exhibit. (S–25 of Certified Record.)

A review of the record and the testimony at the hearing shows that the Ohio EPA conducted its review of the permit applications in accordance with this rule. The Ohio EPA first demonstrated the need to take action to alleviate unsanitary conditions in the area around Rocky Fork Lake. Highland County then took action and came up with a proposal that offered four site options, three types of collection systems, and eleven types of treatment methods. The county investigated and considered a large-scale regional approach with other systems in the county. The city of Hillsboro had no excess capacity, and the city of Greenfield plant was twelve miles away over rough terrain, making connection with that system cost prohibitive. The Ohio EPA reviewed the various options contained in the proposal and did not approve the county's first selected alternative, which was a zero-discharge plan. The county then prepared an addendum to the general plan, which was ultimately approved. The record also reflects that the proposed project actually promotes a centralized approach in that the project will replace a number of package plants and individual systems.

While appellants disagree over whether important economic and social development will result from the project, there is evidence in the record from Ned Sarle's testimony and report from which the Ohio EPA drew its conclusions. As stated earlier in our discussion of the standard of review, the issue before ERAC was not whether the Director's action was the best or most appropriate action, nor whether the board would have taken the same action, but whether the Director's action was unreasonable or unlawful given the evidence presented at the *de novo* hearing. *Red Hill Farm Trust, supra,* at 95, 656 N.E.2d at 1012–1013.

Moreover, it is clear from the record that the preferred treatment alternative, a low pressure collection system using grinder pumps, with a mechanical treatment plant using an oxidation ditch, and a discharge of treated effluent into Rocky Fork Creek, along with the 100–acre wetland constructed by ODNR, is protective of the water quality of the lake and the creek.

In sum, based on our review of the record, we do not find that appellees failed to consider regional or zero-discharge options, nor did the Ohio EPA apply the wrong analysis. The fourth assignment of error is not well taken.

▬ In their fifth assignment of error, appellants argue that ERAC erred in dismissing portions of appellants' appeal for lack of jurisdiction. Specifically, appellants argue that ERAC erred in not considering evidence of the dangers inherent in locating the treatment facility within the Runway Protection Zone of the county airport. Appellants asked ERAC to consider the threat to the

environment "bearing upon the statistical likelihood that airplanes tend to fall out of the sky and strike the ground within the runway protection zone while in the course of attempting landings and attempting departures." (See Notice of Appeal to ERAC, Assignment of Error No. 34.)

ERAC did not exclude all evidence on the airport proximity issue. Evidence was presented that the Federal Aviation Administration and the Ohio Department of Transportation either gave permission for the project or had no further concerns. There were no discussions between Design Enterprises and the Ohio EPA regarding the risks to the lake if an airplane struck the sewage treatment plant facilities. To the extent appellant sought to challenge the acts of the FAA and ODOT in granting permission to proceed with the project, the appeal before ERAC does not appear to be the appropriate forum to address those issues. Accordingly, ERAC did not err in refusing to hear testimony on those issues. The fifth assignment of error is not well taken.

In their sixth assignment of error, appellants reprise their argument that the waters of Rocky Fork Lake and Rocky Fork Creek are ONRW without citing any evidence that those waters have been designated as such as required by Ohio Adm.Code 3745–1–05 and contemplated by federal law. As discussed in connection with assignment of error one, no such designation has occurred for the lake or the creek. The sixth assignment of error is not well taken.

In their seventh assignment of error, appellants argue that the Ohio EPA failed to fairly evaluate a zero-discharge option alternative to the Highland County proposed project. Appellants argue that zero-discharge options were rejected solely because of costs. Again, the evidence in the record actually supports the opposite contention. The evidence indicated that Rapid Infiltration Lagoons were considered and rejected because the technology was considered experimental in Ohio. A land application option was considered and rejected when the county was unable to come to an agreement with the owners of a golf course. A zero-discharge option proposed by appellants involved the use of reed beds. Reed beds are an unproven technology in Ohio, and Indiana has a moratorium on Phragmites (the vegetation used in reed beds) because they multiply prolifically. In sum, the evidence showed that zero-discharge options were reviewed and discarded for other reasons as well as cost. The seventh assignment of error is not well taken.

Based on the foregoing, our review of the record, and in particular the evidence presented at the *de novo* hearing, we conclude that ERAC's decision affirming the Director's decision to issue the PTI and NPDES permit is supported by reliable, probative, and substantial evidence and is in accordance with law.

Accordingly, we overrule appellants' seven assignments of error and affirm the order of the Environmental Review Appeals Commission.

*Order affirmed.*

BROWN and KENNEDY, JJ., concur.