OPINION
{¶ 1} Appellants, the Ohio Department of Agriculture ("ODA"), Fred L. Dailey, the Director of the ODA ("Director"), and Howard F. Wise, the Assistant Director of the ODA, *Page 2 
appeal from an order of the Environmental Review Appeals Commission ("ERAC") vacating the Director's order that revoked the permits to install and permits to operate of appellee, Ohio Fresh Eggs, LLC ("Ohio Fresh Eggs"). For the following reasons, we affirm.
 {¶ 2} Ohio Fresh Eggs owns and operates multiple commercial egg production facilities in Ohio. One facility, located in Croton, Ohio, consists of four layer sites, four pullet sites, and a hatchery.[1]
The other facilities, collectively referred to as the northern facilities, consist of two layer sites and one pullet site.
 {¶ 3} Ohio Fresh Eggs purchased these facilities from Buckeye Egg Farm ("BEF"). While BEF owned and operated the facilities, it habitually violated environmental statutes and regulations. When BEF failed to ameliorate its environmental problems, the Director proposed the revocation of BEF's permits. After a hearing, the Director revoked the permits and ordered BEF to close its facilities no later than June 1, 2004. Subsequent appeals of the Director's order were unsuccessful.
 {¶ 4} Faced with the forced closure of the facilities, BEF decided to sell its assets. A number of potential buyers contacted the ODA and inquired about the application process for acquiring permits to install and to operate the BEF facilities. In June 2002, Jerry Crawford, an attorney representing Austin "Jack" DeCoster, met with the Director to discuss whether DeCoster could get the necessary permits to operate the BEF facilities. Because DeCoster had accrued a poor environmental record in operating his Iowa hog farm, the Director informed Crawford that it was highly unlikely that the ODA would issue DeCoster any permits. *Page 3 
 {¶ 5} Donald Hershey and Orland Bethel also explored the possibility of purchasing BEF assets; specifically, they entered into negotiations to buy the Croton facility. Hershey owns Hershey Equipment Company, which constructs poultry houses and feed mills. Bethel owns Hillandale Farms, LLC, an egg marketing and distribution business. Hershey and Bethel had previously partnered in the ownership of a Pennsylvania egg farm. Ultimately, however, Hershey and Bethel decided not to purchase the Croton facility.
 {¶ 6} Soon after Hershey and Bethel abandoned their plans to purchase the Croton facility, DeCoster approached Hershey with a proposal that he would finance the purchase of the BEF facilities, which Hershey would then operate. Hershey agreed.
 {¶ 7} DeCoster intended to use the proceeds from the sale of his Iowa hog farm to purchase BEF, and in order to avoid taxes on those proceeds, he needed the purchase of BEF to qualify as a like-kind exchange under federal income tax laws. For a like-kind exchange to be successful, DeCoster had to qualify as the "owner" of the BEF facilities under federal income tax law. At the same time, DeCoster wanted to avoid becoming the "owner" of the BEF facilities under Ohio law because he knew that the ODA would probably not grant him the necessary permits to operate the facilities.
 {¶ 8} To solve this problem, Hershey and Bethel formed Ohio Fresh Eggs to purchase BEF. According to the plan, DeCoster would pay $20 million for an option to purchase Ohio Fresh Eggs. In turn, Ohio Fresh Eggs would purchase BEF's assets with the $20 million from DeCoster. Because DeCoster's status as the optionee would remain confidential, only DeCoster, Hershey, and Bethel would know that DeCoster financed the purchase of BEF. Consequently, Ohio Fresh Eggs could purchase BEF and receive the *Page 4 
necessary permits without the ODA discovering, and possibly objecting to, DeCoster's involvement.
 {¶ 9} No one disputes that this arrangement, once completed, resulted in DeCoster becoming the "tax owner" of Ohio Fresh Eggs. At issue in this case, however, is whether DeCoster's involvement was such that Ohio law required his disclosure in the permitting applications.
 {¶ 10} Pursuant to R.C. 903.02(C)(1), an application for a permit to install must include:
 The name and address of the applicant, of all partners if the applicant is a partnership or of all officers and directors if the applicant is a corporation, and of any other person who has a right to control or in fact controls management of the applicant or the selection of officers, directors, or managers of the applicant[.]
An application for a permit to operate must include the same information. R.C. 903.03(C)(1).[2] Once the ODA receives a permit application, it conducts a background check of each entity and/or person named in the application if that entity or person has not operated a concentrated animal feeding facility in Ohio for at least two of the five years immediately proceeding the submission of the application. See R.C. 903.05.
 {¶ 11} In the course of structuring the financing for the purchase of BEF, Ohio Fresh Egg's attorney, Melanie Lehman, sought guidance from the ODA regarding whether R.C. 903.02(C)(1) and 903.03(C)(1) necessitated the inclusion of DeCoster's name in the permit applications. Lehman explained to the ODA that Hershey and Bethel wanted to sell an option to purchase Ohio Fresh Eggs to a confidential optionee. Lehman *Page 5 
also provided the ODA with a brief summary of the option arrangement, which stated in part:
 Both [Hershey] and [Bethel] are going to sell options to purchase their interests in Ohio Fresh Eggs, LLC, and the purchaser(s) of those options are only willing to pay for the right to later purchase the applicant if the identity of the Optionee and its member(s) can remain anonymous. If those options are exercised, as to the permitted facilities, it is the understanding of all the parties that new permits would have to be applied for at that time by the Optionee. As part of the option the Optionee and its owner(s) will place certain restrictions on the removal of money from the operations and required re-investments in the plant and improvements. There is a six (year) management agreement with Mr. Hershey's company and neither the Optionee nor its Member(s) can select any officers of the applicant.
 {¶ 12} During an August 6, 2003 conference call, Hershey and Lehman discussed the summary with ODA employees, including Kevin Elder, Executive Director of the Livestock Environmental Permitting Program ("LEPP"), and Jennifer Tiell, a staff attorney with the LEPP. Lehman explained that Ohio Fresh Eggs needed to sell an option to raise the capital to purchase BEF and that, as part of the option agreement, Ohio Fresh Eggs would have to agree to allow the optionee to impose certain restrictions on Ohio Fresh Eggs' operations.
 {¶ 13} Prior to this conference call, the LEPP staff had discussed the situation and concluded that Ohio law did not require an applicant to name a "purely passive investor," i.e., one "who acted like a bank," in permit applications. (Tr. 363.) This interpretation of the relevant statutes and rule is consistent with the Director's interpretation. According to the Director, an applicant need not disclose a "passive investor," "same as a bank * * * an insurance company, or the farm credit system, or any other financial institution." (Tr. 276-277.) *Page 6 
 {¶ 14} During the August 6, 2003 conference call, Elder asked if Hershey and Lehman would describe the option arrangement as "a banking situation with a purely passive investor," and Hershey said "yes." (Tr. 363.) Elder and Tiell then indicated that the relevant Ohio law did not require the disclosure of the optionee's name.
 {¶ 15} Ohio Fresh Eggs did not list DeCoster's name and address in its permit applications. On December 23, 2003, the ODA issued four permits to install and four permits to operate for the four sites at the Croton facility. Three days later, ownership of the Croton facilities transferred from BEF to Ohio Fresh Eggs. On that same day, DeCoster, Hershey, and Bethel executed the "Option to Purchase" agreement. In relevant part, the option agreement provided:
 7. Conduct of business of Fresh Eggs. In order to assure Optionee as to the continuing and growing business value of Fresh Eggs, and provide Optionee with the intimate financial and operational knowledge as to the business of Fresh Eggs in order to formulate a decision as to the exercise of the Option granted herein, Optionors and Fresh Eggs do hereby agree to certain limited participation by the Optionee or its designate in the conduct of the business of Fresh Eggs and certain limitations on the conduct of such business by Fresh Eggs during the Option Period. However, the parties hereto agree that except as otherwise set forth in this Agreement (and the Master Agreement), Fresh Eggs and its management, Fresh Eggs Manager, LLC shall have full, complete and exclusive discretion to manage and control the business of Fresh Eggs, Fresh Eggs Manager, LLC shall make all decisions affecting the business of Fresh Eggs and shall manage and control the affairs of Fresh Eggs to the best of its ability and use its best efforts to carry out the purpose of Fresh Eggs. * * *
 {¶ 16} Section 7 also provided for the election of a management committee, which would include a non-voting representative of DeCoster. Furthermore, it stated:
 (b) Restrictions on Management Committee. In general, the day to day business of Fresh Eggs shall be conducted by Fresh Eggs Manager, LLC (herein the "Manager"), subject to the decisions and guidelines established by the Management *Page 7 
Committee. All decisions of the Management Committee shall be determined by a majority vote, except the following action shall not be approved or undertaken by the Management Committee, the Manager, any officer or any other representative or agent of Fresh Eggs, unless specifically approved by the representative of the Optionee; * * *
Those "following action[s]" included: (1) the expansion of the number of members of the management committee or the replacement of any member of the management committee; (2) the approval of the annual budget; (3) any borrowing of funds and/or the granting of any collateral or security interest in Ohio Fresh Eggs' assets; (4) the employment or termination of any senior management employee, with the limitation that the representative's approval would not be unreasonably withheld; and (5) the purchase or acquisition of any material asset exceeding a cost of $25,000, provided that Ohio Fresh Eggs could expend funds needed for environmental compliance without the representative's approval.
 {¶ 17} Additionally, Section 7 allowed DeCoster to modify a previously approved budget to meet production-cost or efficiency needs or market conditions. However, Section 7 prohibited DeCoster from making any modification that would prevent Ohio Fresh Eggs from complying with its commitments to the ODA to make environmental improvements.
 {¶ 18} In addition to the option agreement, DeCoster, Hershey, and Bethel also executed a "Master Agreement," which obligated DeCoster to supply Ohio Fresh Eggs with working capital. Moreover, the master agreement required DeCoster to supply adequate funds to allow Ohio Fresh Eggs to complete the improvements necessary to ensure compliance with environmental laws. *Page 8 
 {¶ 19} On February 2, 2004, the ODA issued three permits to install and three permits to operate for the three sites at the northern facilities. Ownership of the northern facilities transferred from BEF to Ohio Fresh Eggs on February 18, 2004.
 {¶ 20} For the first six months of 2004, the ODA observed improved conditions at the Croton and northern facilities. However, in the summer of 2004, problems arose again. While investigating those problems, ODA employees began to hear of DeCoster's involvement with the facilities. In October 2004, Crawford (DeCoster's attorney) met with ODA employees and disclosed that DeCoster was the confidential optionee. Subsequently, DeCoster and Ohio Fresh Eggs provided the ODA with the various agreements governing their relationship.
 {¶ 21} On September 29, 2005, the Director notified Ohio Fresh Eggs that he was proposing to revoke its permits for failure to comply with R.C. 903.02(C)(1) and 903.03(C)(1). Pursuant to Ohio Adm. Code 901:10-1-03(A)(1), the Director may revoke a permit to install and/or a permit to operate if "[t]he permit application contains misleading or false information." The Director stated that Ohio Fresh Eggs' permit applications contained misleading or false information because Ohio Fresh Eggs failed to provide DeCoster's name and address in any of the applications.
 {¶ 22} Ohio Fresh Eggs requested and received a hearing. During the hearing, witnesses testified to the above facts. Additionally, the ODA presented the testimony of Dr. Neil E. Harl, who the hearing examiner accepted as an expert in economics. Harl testified extensively regarding the continuum between pure debt, exemplified by a secured loan, and pure equity, exemplified by a share of voting common stock. According to Harl, four factors determine where on the continuum a particular financial arrangement fits: (1) the type of compensation paid to the investor, (2) the term of the *Page 9 
investor's commitment, (3) the involvement of the investor in management, and (4) the priority in which the investor is repaid. Harl then applied the four factors to the terms of the instant transaction. In considering Section 7(b) of the option agreement, Harl testified that DeCoster's representative had the power to veto certain "major" actions of the management committee. Harl characterized the veto power over acquisitions of more than $25,000 as a "very tight control over management." (Tr. 481.) Because control over management is a factor that indicates an equity transaction, Harl opined that the instant transaction rested toward the equity end of the continuum.
 {¶ 23} Ohio Fresh Eggs presented the testimony of its own expert witness, William Smith, who the hearing examiner accepted as an expert in the tax treatment of businesses, business formation, the purchase and sale of businesses, and the creation of transactional and lending documents. Smith, acting as DeCoster's attorney, participated in the negotiation and drafting of the master agreement and the option agreement. Smith identified Section 7(b) as the contractual provision setting forth the restrictions DeCoster could impose upon Ohio Fresh Eggs' actions. Smith stated that these "classic lender restrictions" served to protect DeCoster's investment by allowing him to restrict change in the management of Ohio Fresh Eggs. Smith testified that the restrictions did not permit DeCoster to manage the day-to-day affairs of Ohio Fresh Eggs. Moreover, Smith opined that these restrictions were "exactly the same things as a commercial lender would normally require." (Tr. 1310.) Smith also compared Section 7(b) to the restrictions contained in a loan agreement between MetLife Insurance Company and Ohio Fresh Eggs, and he concluded that they were "substantially identical." (Tr. 1320.)
 {¶ 24} On October 31, 2006, the hearing examiner issued his report and recommendation. The hearing examiner found that the powers that DeCoster received *Page 10 
under Section 7(b) of the option agreement allowed DeCoster to exercise control over or to possess the right to control the management of Ohio Fresh Eggs. Because DeCoster retained the type of control contemplated in R.C. 903.02(C)(1) and 903.03(C)(1) and Ohio Adm. Code 901:10-1-02(A)(4)(a), the hearing examiner concluded that Ohio Fresh Eggs provided misleading or false information when it omitted DeCoster's name from its permit applications. Thus, the hearing examiner recommended that the Director revoke Ohio Fresh Eggs' permits.
 {¶ 25} In reaching this recommendation, the hearing examiner refused to consider evidence that the ODA offered of events that occurred after it issued the permits. The hearing examiner stated that his task was to determine whether DeCoster possessed sufficient control during the application process to require the disclosure of his involvement. According to the hearing examiner, addressing that issue only required consideration of events that occurred while the application remained pending.
 {¶ 26} On November 30, 2006, the Director approved and confirmed the hearing examiner's recommendation and revoked Ohio Fresh Eggs' permits. Although the Director adopted the hearing examiner's findings of fact and conclusions of law, he reversed the hearing examiner's decision to limit the evidence to events that occurred prior to the issuance of the permits. Ohio Fresh Eggs appealed the Director's order to ERAC. After a review of the evidence, ERAC determined that the testimony and documentary evidence did not support the Director's conclusions of law, and thus, ERAC concluded that the Director's action was unreasonable. Based upon that conclusion, ERAC issued an order vacating the Director's order.
 {¶ 27} Significantly, in reaching its conclusion, ERAC found that the Director failed to assign the appropriate weight to Smith's expert testimony. Additionally, ERAC *Page 11 
concluded that evidence of events that post-dated the issuance of the permits was not relevant. Like the hearing examiner, ERAC determined that the case turned upon whether DeCoster had control or the right to control at the time Ohio Fresh Eggs filed its permit applications. Because the various agreements between DeCoster and Ohio Fresh Eggs defined the parties' relationship at that point, ERAC held that those agreements — and not later events — reflected whether DeCoster had the type of control which would require the disclosure of his name in Ohio Fresh Eggs' permit applications.
 {¶ 28} The ODA now appeals ERAC's decision to this court and assigns the following errors:
 1. The Environmental Review Appeals Commission ("ERAC") erred in interpreting the phrase "misleading or false information" in the Ohio Administrative Code 901:10-1-03(a)(1) to require an intent to deceive the Director on the part of the permit applicant.
 2. The ERAC erroneously substituted its judgment for the decision of the Director to revoke the applicant's permits on the basis of the evidence and the Report and Recommendation of the Hearing Examiner.
 3. The ERAC erred when it relied on the testimony of the drafters of the master agreement and option to purchase rather than the terms of the actual documents.
 {¶ 29} We will begin our analysis by addressing the ODA's second assignment of error, in which it argues that ERAC improperly substituted its judgment for that of the Director. We disagree.
 {¶ 30} This court reviews ERAC's order to determine whether it "is supported by reliable, probative, and substantial evidence and is in accordance with law." R.C. 3745.06. ERAC reviews the Director's order under a different and less restrictive standard of review. Pursuant to R.C. 3745.05, ERAC must affirm the Director's action if it *Page 12 
is "lawful and reasonable" and vacate or modify the action if it is "unreasonable or unlawful."
 {¶ 31} This court first expounded upon the reasonableness standard inCitizens Commt. to Preserve Lake Logan v. Williams, 56 Ohio App.2d 61("Lake Logan"), where we held:
 "Unreasonable" means that which is not in accordance with reason, or that which has no factual foundation. It is only where [ERAC] can properly find from the evidence that there is no valid factual foundation for the Director's action that such action can be found to be unreasonable. Accordingly, the ultimate factual issue to be determined by [ERAC] * * * is whether there is a valid factual foundation for the Director's action and not whether the Director's action is the best or most appropriate action, nor whether [ERAC] would have taken the same action.
Id., at 70. This court has consistently cited this explanation when setting forth ERAC's standard of review. See, e.g., General Elec.Lighting v. Koncelik, Franklin App. No. 05AP-310, 2006-Ohio-1655, at ¶ 34, 38; Save the Lake v. Schregardus (2001), 141 Ohio App.3d 530,537-538; CECOS Internatl., Inc. v. Shank (1991), 74 Ohio App.3d 43, 45.
 {¶ 32} Inherent in the reasonableness standard is a substantial degree of deference for the Director's determination. ERAC may not substitute its judgment for that of the Director. Lake Logan, 69-70. See, also,Northeast Ohio Regional Sewer Dist. v. Shank (1991), 58 Ohio St.3d 16,25. However, at the same time, ERAC may not simply adopt the Director's judgment without reviewing and judging the evidence itself. Indeed, the reasonableness standard requires ERAC to consider whether the factual foundation that underlies the Director's action is "valid." In conducting this inquiry, ERAC must determine whether the evidence is of such quantity and quality that it provides a sound support for the Director's action. In other words, ERAC must engage in a limited weighing of the evidence. *Page 13 
 {¶ 33} In the case at bar, the Director found that because Section 7(b) of the option agreement reserved to DeCoster the "right to control," Ohio Fresh Eggs submitted misleading or false information when it omitted DeCoster's name and address from the application. Therefore, on review of the Director's order, ERAC considered whether the evidence adequately supported the Director's determination that the option agreement invested DeCoster with a "right to control" the management of Ohio Fresh Eggs.
 {¶ 34} No statute, regulation, or guidance document defines the point at which influence over an applicant becomes the "right to control" the management of the applicant. However, the Director, Elder, and Tiell all testified that R.C. 903.02(C)(1) and 903.03(C)(1) do not require an applicant to disclose the identity of a bank or other commercial lender. Thus, the ODA interprets "right to control" to mean influence greater than the type of authority a commercial lender typically would have over a borrower's management.
 {¶ 35} Generally, "[w]hen interpreting statutes, courts must give due deference to those interpretations by `an agency that has accumulated substantial expertise and to which the General Assembly has delegated enforcement responsibility.'" Shell v. Ohio Veterinary Med. LicensingBd., 105 Ohio St.3d 420, 2005-Ohio-2423, at ¶ 34, quoting Weiss v.Public Util. Comm. of Ohio, 90 Ohio St.3d 15, 17-18, 2000-Ohio-5. See, also, Northwestern Ohio Bldg. Constr. Trades Council,92 Ohio St.3d 282, 287, 2001-Ohio-190. Because the ODA's interpretation of the phrase "right to control" is reasonable, we accord it deference and utilize it in our review of this case. Consequently, we must determine whether ERAC erred in concluding that DeCoster's authority over Ohio Fresh Eggs did not exceed the level of authority a commercial lender normally has over its borrower's management. *Page 14 
 {¶ 36} The testimony of only two witnesses — Harl and Smith — bears upon the question of whether the various agreements at issue gave DeCoster greater control over Ohio Fresh Eggs than a commercial lender would typically have. ERAC found that Smith's area of expertise and the substance of his testimony were much more germane and persuasive than Harl's testimony. As a result of this finding, ERAC concluded that it was unreasonable for the Director to have ignored Smith's testimony in favor of Harl's. We find that reliable, probative, and substantial evidence supports ERAC's conclusion.
 {¶ 37} First, the hearing examiner accepted Harl as an expert witness in the general area of economics, while he accepted Smith as an expert in the creation of transactional and lending documents. Smith's more specific area of expertise relates directly to the issue this case turns upon: the kind of control a lending institution typically negotiates as part of a loan agreement. Second, Harl's testimony did not squarely address the operative issue in this case. Harl's testimony primarily focused upon the debt/equity continuum and the four factors that determine where on that continuum a particular business transaction fits. In considering the third factor — the investor's involvement in management — Harl analyzed Section 7(b), and he found that the control over management sanctioned by Section 7(b) moved the instant transaction toward the equity end of the continuum. However, the instant transaction's location on the debt/equity continuum is only marginally relevant to the central inquiry — whether a commercial lender would normally require the type of authority over a borrower that Section 7(b) granted DeCoster. Smith, unlike Harl, specifically answered that inquiry in his testimony. Smith testified that the restrictions on management included in Section 7(b) were identical to the restrictions a commercial lender would normally require. Comparing Section 7(b) to the provisions of a loan agreement between Ohio Fresh Eggs *Page 15 
and MetLife Insurance Company, Smith showed that the loan agreement allowed MetLife to exercise the same type of authority over Ohio Fresh Eggs that Section 7(b) allowed DeCoster.
 {¶ 38} Given the area of Smith's expertise and the substance of his testimony, we conclude that ERAC did not err in finding that it was unreasonable for the Director to ignore Smith's testimony in favor of Harl's testimony. ERAC did not substitute its judgment for that of the Director, but rather, judged the reasonableness of the Director's action by engaging in a limited weighing of the evidence underlying his revocation order.
 {¶ 39} The ODA, however, argues that events that occurred after it issued the permits undercut Smith's testimony and indicate that DeCoster, in fact, exercised control of Ohio Fresh Eggs' management. Neither the hearing examiner nor ERAC found the events that unfolded after the issuance of the permits relevant to whether the permits contained misleading or false information. We agree with ERAC's conclusion that post-issuance evidence is not pertinent to our analysis here.
 {¶ 40} At the time Ohio Fresh Eggs submitted the permit applications, its relationship with DeCoster was defined solely by the various agreements between the parties. Accordingly, whether DeCoster had a "right to control" the management of Ohio Fresh Eggs depends upon the terms of those agreements. If the agreements did not give DeCoster the "right to control," then the omission of DeCoster's name from the permit applications would not constitute the transmission of misleading or false information.
 {¶ 41} The ODA contends that evidence of how the parties performed the agreements would elucidate the meaning of the agreements. However, courts resort to consideration of the parties' performance of a contract to clarify ambiguous contractual language. State ex rel. Burgess Niplev. Linzell (1950), 153 Ohio St. 545, syllabus *Page 16 
("Where * * * words used in [a] contract are reasonably susceptible ofmore than one interpretation and the parties to such contract have by their acts and conduct in the performance of the contract over a reasonable period of time mutually adopted one of those interpretations, the interpretation so adopted will be given to those words.") (Emphasis added); Cincinnati Ins. Co. v. ACE INA Holdings, Inc., Hamilton App. No. C-060384, 2007-Ohio-5576, at ¶ 33 (same). The ODA has not identified any ambiguity in the agreements, and upon review of the relevant portions of the agreements (particularly Section 7(b) of the option agreement), we do not find any ambiguity. Thus, evidence of the events that occurred after the issuance of the permits has no bearing upon whether the agreements granted DeCoster a "right to control" the management of Ohio Fresh Eggs for purposes of R.C. 903.02(C)(1) or 903.03(C)(1). Accordingly, we find that ERAC's refusal to consider the post-issuance evidence is in accord with law.
 {¶ 42} In sum, we conclude that ERAC properly applied its standard of review in deciding the instant case. Reliable, probative, and substantial evidence supports ERAC's determination that the Director's revocation of Ohio Fresh Eggs' permits was unreasonable. Therefore, we overrule the ODA's second assignment of error.
 {¶ 43} The ODA argues in its first assignment of error that ERAC erred in holding that a permit applicant does not provide "misleading or false information," and thus violate Ohio Adm. Code 901:10-1-03(A)(1), unless the applicant intended to deceive the Director. Based upon our resolution of the second assignment of error, this argument is moot.
 {¶ 44} Regardless of whether the phrase "misleading or false information" requires an intent to deceive, we have already concluded that reliable, probative, and substantial evidence supports ERAC's determination that Ohio Fresh Eggs did not have to disclose DeCoster in its permit applications. As we stated above, if DeCoster did not have the *Page 17 
"right to control" the management of Ohio Fresh Eggs for purposes of R.C. 903.02(C)(1) or 903.03(C)(1), then the permit applications did not include misleading or false information when they omitted DeCoster's name. Given Smith's testimony, DeCoster possessed no more "right to control" Ohio Fresh Eggs than a commercial lender would possess. Thus, applying the ODA's interpretation of "right to control" to this situation, R.C. 903.02(C)(1) and 903.03(C)(1) did not require the disclosure of DeCoster's name in the permit applications. Accordingly, we need not address the issue raised in the ODA's first assignment of error.
 {¶ 45} In its third assignment of error, the ODA contends that ERAC erred when it relied upon the testimony of the drafters of the master agreement and option agreement rather than the terms of the actual agreements. We disagree.
 {¶ 46} Based upon the ODA's own interpretation of the relevant statutes and rule, the central issue confronting the Director was whether a commercial lender would normally require the same type of control over a borrower that Section 7(b) granted DeCoster. Because resolution of this issue necessitates an evaluation of the contractual terms in light of what restrictions a lender normally imposes, ERAC could not limit its review to just the terms of the master agreement and/or the option agreement. Rather, ERAC needed expert testimony to explain how the control provisions of the relevant agreements compared to the control provisions of a typical commercial loan. Smith's testimony directly addressed this issue. Accordingly, we overrule the ODA's third assignment of error.
 {¶ 47} For the foregoing reasons, we find that the ODA's first assignment of error is moot, and we overrule the ODA's second and third assignments of error. *Page 18 
Consequently, we affirm the findings of fact, conclusions of law, and final order of the Environmental Review Appeals Commission.
Judgment affirmed.
BROWN and FRENCH, JJ., concur.
[1] A "pullet" is a chicken that is too young to lay eggs. Once a chicken is mature enough to lay eggs, it is called a "layer."
[2] Additionally, Ohio Adm. Code 901:10-1-03(A)(4)(a) reiterates the name and address requirement contained in R.C. 903.02(C)(1) and903.03(C)(1). *Page 1