DECISION
{¶ 1} Plaintiffs-appellants/cross-appellees, the Ohio Roundtable, the Board of Trustees of the Columbus South District of the United Methodist Church, and several individual persons (collectively "plaintiffs"), appeal from a judgment of the Franklin County Court of Common Pleas that (1) found Am.Sub.H.B. No. 405 ("H.B. 405"), authorizing Ohio's participation in the multi-state lottery, to be constitutional, but (2) concluded certain provisions of that legislation were unconstitutional insofar as they returned lottery income to the general fund.
 {¶ 2} Plaintiffs commenced this action seeking declaratory and injunctive relief by filing a complaint in the Franklin County Court of Common Pleas that challenged the constitutionality and legality of various provisions of H.B. 405, which authorizes Ohio's participation in a multi-state lottery game popularly marketed as Mega Millions. The complaint named as defendants Governor Robert A. Taft, II, the Ohio Lottery Commission ("commission"), the individual members of the commission in their official capacities, and the director of the commission in his official capacity (collectively "the state").
 {¶ 3} In its final form, the complaint contains 11 claims the trial court addressed. The first three allege that the constitutional requirements for instituting and managing a state-run lottery were not satisfied by the terms under which H.B. 405 authorized Ohio's participation in the Mega Millions game. The fourth and fifth claims allege that, contrary to constitutional requirements, the entire proceeds from the Mega Millions game will not go to support public education. The sixth claim seeks declaratory judgment that H.B. 405 violates the Single Subject Rule of Section 2(D), Article XV, Ohio Constitution. The seventh and eighth claims seek a writ of mandamus based upon the allegations set forth in the first five claims. The final three claims allege statutory violations, specifically that the administrative rules the commission filed in connection with the Mega Millions game were not validly promulgated, and that the governor acted prematurely in authorizing the commission to enter into a multi-state lottery.
 {¶ 4} The trial court rendered a lengthy, detailed, and thorough decision in which it found for the state on all claims except the fifth, which asserts that H.B. 405 improperly diverted the lottery funds from Ohio educational programs. On this question, the trial court found that certain of H.B. 405's provisions violate the constitutional requirement that all lottery proceeds be used for education in Ohio, because they return to the general fund, in an amount equal to the expected revenues from the Mega Millions game, budget amounts previously appropriated for education. The trial court found H.B. 405 otherwise valid and, thus, Ohio's participation in the Mega Millions game to be constitutional and legal.
 {¶ 5} Plaintiffs have timely appealed, and bring the following seven assignments of error:
 {¶ 6} "1. The trial court erred in declaring the Am. Sub. H.B. No. 405 (H.B. 405) does not unconstitutionally delegate to the Governor the General Assembly's authority to authorize a state agency to conduct a lottery.
 {¶ 7} "2. The trial court erred in declaring that H.B. 405 does not delegate to other states the General Assembly's authority to authorize a state agency to conduct a lottery.
 {¶ 8} "3. The trial court erred in declaring that the statewide joint lottery game provisions of H.B. 405 do not violate the requirement in Art. XV, § 6 of the Ohio Constitution that any lottery in Ohio be conducted by an agency of the state.
 {¶ 9} "4. The trial court erred in declaring that the Ohio Constitution does not require the entire net proceeds from a multi-state lottery game to be used for education programs in Ohio.
 {¶ 10} "5. The trial court erred in declaring that H.B. 405 does not violate the single subject rule of the Ohio Constitution.
 {¶ 11} "6. The trial court erred in declaring that the administrative rules filed by the Ohio Lottery Commission on February 14, 2002 are valid.
 {¶ 12} "7. The trial court erred in declaring that the Governor did not act prematurely in authorizing the Director of the Lottery Commission to enter into a multi-state lottery agreement."
 {¶ 13} The state has timely cross-appealed, and brings the following single assignment of error:
 {¶ 14} "The trial court erred by striking the uncodified provision of the Budget Correction Bill that transferred money back to the General Revenue Fund from the Department of Education's forecasted budget."
 {¶ 15} A brief history of the lottery in Ohio is a useful preface to a discussion of the issues raised in this appeal. The state lottery in Ohio exists as an exception to a general constitutional prohibition against lotteries, reflected by the original text of Section 6, ArticleXV, Ohio Constitution: "[l]otteries, and the sale of lottery tickets, for any purpose whatever, shall forever be prohibited in this State." The widespread public aversion toward gambling of any sort was reflected in this constitutional prohibition when the Ohio Constitution of 1851 was adopted. Mills-Jennings, Inc. v. Dept. of Liquor Control (1982),70 Ohio St.2d 95. It was not until 1973, after several attempts, that the constitution was amended to permit the state to operate a state lottery on clearly and narrowly defined terms, including the restriction added in 1988 that all proceeds from the state lottery go to fund education in Ohio. The statewide Ohio lottery thereafter was instituted and operated under the direction of the commission, appropriate enabling legislation, and accompanying administrative regulations.
 {¶ 16} In 1988, the commission began exploring the possibility of participating in a multi-state lottery game. A formal opinion was requested from the Ohio Attorney General on the constitutionality of Ohio's participation in such a joint lottery. The Attorney General subsequently rendered his opinion that participation in such a game was not constitutional. 1988 Ohio Atty.Gen.Ops. No. 88-002. The opinion and other factors bolstered legislative reluctance, and ultimately no legislation in furtherance of participation in a multi-state lottery was enacted at that time. All parties to the present appeal agree that a formal Attorney General's Opinion rendered pursuant to R.C. 109.12 may be persuasive authority but is not binding precedent upon a court of law. State ex rel. N. Olmstead Firefighter's Assn. v. N. Olmstead (1992),64 Ohio St.3d 530, 533.
 {¶ 17} After a substantial interval, interest in participation in a multi-state lottery was revived in 1999 for several reasons. Lottery officials and legislators sought to enhance revenues by both reviving flagging public interest in existing Ohio lottery games, and reducing revenue lost, particularly in border areas, to competing multi-state lottery games with higher jackpots than that offered by the Ohio Lotto game. After legislative maneuvering spanning several years, the multi-state lottery provisions at issue were worked into H.B. 405, a bill then in committee and originally addressing some non-lottery purposes. As an interesting augury to the present challenge under the single-subject rule, H.B. 405's subject description on the Legislative Service Commission status report was at one time listed as "Mental retardation and developmental-services/revised county board membership." The bill was altered extensively over time and eventually described as a "budget correction" measure. (Text of H.B. 405 as introduced and as passed by the House, Plaintiffs' exhibits A and C.)
 {¶ 18} The Statewide Joint Lottery Provisions contained in H.B. 405 amended the Revised Code and authorized the director of the commission, if the governor so instructed, to enter into suitable agreements to operate "statewide joint lottery games." H.B. 405, 61-69; R.C. 3770.02(J)(2). The amended statutory provisions define such a statewide joint lottery game as "a lottery game that the commission sells solely within this state under an agreement with other lottery jurisdictions to sell the same lottery game solely within their statewide or other jurisdictional boundaries." R.C. 3770.02(J)(1). Certain uncodified sections of H.B. 405 consisted of revenue-producing provisions mandating that the commission generate an additional $41 million in profits to be directed to the Lottery Profits for Education Fund. H.B. 405, Section 36(2). Related sections of the bill also directed the Director of Budget and Management to decrease general fund appropriations to the Department of Education by an equal amount. Id.
 {¶ 19} Pursuant to the statutory language enacted by H.B. 405, the commission began participation in the Mega Millions lottery game in May 2002, as a party to and under the terms of a formal agreement known as the Multi-State Lottery Agreement.
 {¶ 20} Armed with this brief retrospective overview, we now turn to plaintiffs' first assignment of error, which asserts that the multi-state lottery provisions unconstitutionally delegate to the governor the General Assembly's narrowly circumscribed authority to authorize a state agency to conduct a lottery. The 1973 and 1988 amendments created an exception to Section 6, Article XV's general prohibition on lotteries:
 {¶ 21} "The General Assembly may authorize an agency of the state to conduct lotteries, to sell rights to participate therein, and to award prizes by chance to participants, provided that the entire net proceeds of any such lottery are paid into a fund of the state treasury that shall consist solely of such proceeds and shall be used solely for the support of elementary, secondary, vocational, and special education programs as determined in appropriations made by the General Assembly."
 {¶ 22} Plaintiffs argue that, under this constitutional provision, the General Assembly has the sole authority to authorize an agency of the state to conduct lotteries, and that no such authority is granted to the governor or any other state official. Plaintiffs observe that R.C. 3770.02(J)(2), as amended by H.B. 405, provides that "[i]f the governor directs the director to do so, the director shall enter into an agreement with other lottery jurisdictions to conduct statewide joint lottery games. If the governor signs the agreement personally or by means of an authenticating officer * * * the director then may conduct statewide joint lottery games under the agreement."
 {¶ 23} Plaintiffs argue that this provision transfers from the General Assembly to the governor the authority to participate in a multi-state lottery; that it in fact rests sole discretion in the governor as to whether Ohio will join such a multi-state game. Plaintiffs argue the provision constitutes an unlawful delegation of legislative power because (1) it is contrary to the express provisions of Section 6, Article XV, which give the legislature the power to authorize "an agency of the state" to conduct a lottery and do not mention authorizing the governor to do so, and (2) the amended statute fails to set standards to limit or guide the exercise of this power granted to the governor.
 {¶ 24} We commence by noting that all legislative enactments enjoy a strong presumption of constitutionality. Austintown Twp. Bd. of Trustees v. Tracy (1996), 76 Ohio St.3d 353. A reviewing court addressing a constitutional challenge to a statute must accordingly apply all presumptions and rules of construction so as to uphold the statute. State v. Dorso (1983), 4 Ohio St.3d 60. The party challenging the constitutionality of the statute must meet the burden of proving beyond a reasonable doubt that the law is incompatible with the pertinent constitutional provisions. State ex rel. Dix v. Celeste (1984),11 Ohio St.3d 141, 142.
 {¶ 25} We agree with the trial court that R.C. 3770.02(J)(2), as amended by H.B. 405, simply permits the governor to enforce the General Assembly's previous legislative determination that the commission is empowered to enter into a multi-state lottery game. Section 6, Article XV states that the General Assembly may authorize "an agency" of the state to conduct a lottery game. Whether the General Assembly chooses to pursue such an authorization by directly conferring authority upon the commission, a state agency, or by authorizing the governor to direct the commission to do so, is a distinction without a difference. Addressing similar considerations of delegation of authority, the Ohio Supreme Court has stated that, while the General Assembly clearly cannot delegate its lawmaking function, it can confer discretion as to its execution to an administrative agency. Strain v. Southerton (1947), 148 Ohio St. 153,160; State v. Abdulla (1973), 37 Ohio App.2d 82, 89 ("[i]n the delegation of power to an administrative agency, the test should be: does such delegation relate to execution?"). The governor is the supreme executive of the state, and a responsibility delegated to an executive agency is essentially delegated to the governor's subordinate. Section 5, ArticleIII, Ohio Constitution. The commission is an executive agency, and the lottery director is a member of the governor's cabinet, serving at the pleasure of the governor. R.C. 3770.02(A). Under this constitutional and statutory executive hierarchy, we discern no constitutionally impermissible delegation of legislative power in the legislature's choice to authorize the governor, rather than his subordinate directly, to enter into a multi-state lottery agreement. Plaintiffs' first assignment of error is overruled.
 {¶ 26} Plaintiffs' second assignment of error asserts that the Joint Lottery Provisions unlawfully delegate authority to other states because, by definition, a multi-state lottery would require mutual authorization, agreement, and participation by other states before Ohio could take part in the game. Plaintiffs reason that, because Section 6, Article XV states only that the General Assembly may authorize "an agency of the state" to conduct a lottery, the dependency on other states, inherent in a multi-state lottery, renders Ohio's participation unconstitutional.
 {¶ 27} Under the new enactments, the commission is given the authority to run a "statewide joint lottery game," defined by statute as "a lottery game that the commission sells solely within this state under an agreement with other lottery jurisdictions to sell the same lottery game solely within their statewide or other jurisdictional boundaries." R.C. 3770.02(J)(1). Unquestionably, the existence of, and participation by, other states is a prerequisite to a "statewide joint lottery game" and Ohio's conducting a multi-state lottery. The existence of these necessary underlying conditions as a prerequisite to Ohio's participation in a multi-state lottery do not, however, amount to a legislative delegation of authority, any more than the necessity for willing retail agents to sell lottery tickets, and willing purchasers to buy them, constitutes a delegation of authority, even though in their absence a lottery game, be it single-state or multi-state, would not be sustainable. R.C. 3770.02 does not require the director to cede any authority to other participating states, beyond the bare precondition that those other states be willing to contract with Ohio and each other to engage in a multi-state lottery. The terms of the multi-state lottery agreement remain Ohio's to accept or reject pursuant to the authority granted to the commission by the legislature.
 {¶ 28} We conclude that this provision does not constitute a grant of authority in any form that would impinge upon the General Assembly's exclusive authority, under Section 6, Article XV, to authorize an agency of the state to conduct a lottery game. While plaintiffs are correct that a multi-state lottery, by definition, requires mutual agreement among the participating states permitting each other to take part, this agreement does not rise to the level of a violation of Section 6, Article XV. Plaintiffs' second assignment of error is overruled.
 {¶ 29} Plaintiffs' third assignment of error asserts that the commission will not "conduct" the multi-state lottery, because participation in the Mega Millions game requires Ohio to cede significant aspects of control of the game to the other participating states. Specifically, plaintiffs argue that the commission legally and constitutionally can conduct a multi-state lottery only where the lottery game in question properly can be said to consist of separate, independently operated games in each participating state. In other words, plaintiffs might find it acceptable for states to collaborate to promote and market their individual lottery games under a common name and trade dress. By contrast, where jackpots are pooled, and the times and means of selecting of winners, the setting of prize amounts, and the resolution of disputes are placed in the hands of the multi-state lottery organization, plaintiffs assert that Ohio cannot be said to "conduct" even its own share of the game. As examples of Ohio's cession of authority, plaintiffs specifically point to the terms of the multi-state agreement that require consortium members to share financial responsibility for jackpot payments, and other terms that allocate responsibility for various aspects of operation of the Mega Millions game among the member states.
 {¶ 30} The parties propose different definitions of the term "to conduct." Plaintiffs suggest the definition found in Black's Law Dictionary (5 Ed. 1979) 268: "To manage; direct; lead; have direction; carry on; regulate, do business." The state proposes a similar, but more developed, comparative definition appearing in Webster's 9th New Collegiate Dictionary (1983) 274: "Conduct implies taking responsibility for the acts and achievements of a group; manage implies direct handling and manipulating or maneuvering toward a desired result; control implies a regulating or restraining in order to keep within bounds or on a course; direct implies constant guiding and regulating so as to achieve smooth operation."
 {¶ 31} Either definition implies a strong degree of delegatory authority. Applying these definitions, the state argues, and we agree, that it retains sufficient supervision over the multi-state lottery to meet the standard of "conducting" a lottery under Section 6, Article XV.
 {¶ 32} Ohio undisputedly contracts with various vendors for the operation and promotion of the lottery, whether for existing in-state games or the new multi-state Mega Millions. The parties agree that for existing in-state games the commission purchases licenses from sporting and entertainment entities for promotional purposes. The commission contracts some data processing functions to an out-of-state vendor. Similarly, printing, advertising, TV production and other duties are contracted with in — and out-of-state vendors. As described in the testimony of the commission director, the Mega Millions game will likewise require Ohio to "outsource" certain functions, but some of these will go to the other state members of the lottery, as the member states have agreed to divide the burden of operations among themselves: Georgia conducts the drawings, Illinois tracks state-by-state sales and computes each state's proportionate contribution to the jackpot, Michigan tracks common operating expenses and bills them back to member states, and Virginia serves as a clearinghouse for prize disbursements. (Dennis G. Kennedy depo. at 23-32.)
 {¶ 33} As long as such delegation of services allows the commission to ensure that the integrity and operation of the games is maintained according to Ohio statutes and regulations governing the lottery, we see no obstacle to the commission's contracting for certain lottery services in the same manner as other state agencies may choose to contract for work in order to execute their assigned tasks. Indeed, plaintiffs do not specifically assert that the commission's practice of doing so for in-state games is illegal or unconstitutional. No significant distinction exists between Ohio's "contracting" with another state and its contracting with a commercial entity to provide services in operation of a game, as long as in both instances the Ohio statutes and regulations governing the lottery are complied with and the commission "directs" the games. This aspect of the multi-state lottery agreement does not violate Section 6, Article XV.
 {¶ 34} Plaintiffs further argue that the sharing of jackpots constitutes a troubling aspect of the multi-state lottery in terms of determining whether the commission "conducts" the game. If the winner of the jackpot purchased a ticket in another participating state, Ohio would pay a proportional share of the jackpot to the winner, even though Ohio had no control over the licensing of the agent who sold the ticket, the validation of the ticket, or the local conditions of disbursement for the winning ticket. To this extent, plaintiffs argue, Ohio relinquishes control over the game and does not direct it. Similarly, if an Ohio ticket wins the jackpot, the jackpot prize largely will be funded from sales of tickets in other states over which the commission had no control or direction.
 {¶ 35} The state contends that the conditions of ticket sales and prize payments in other states are of no consequence. According to the state, because the Mega Millions game is actually nine independent lottery games conducted in their nine separate states, Ohio's direction of the game need only extend to cover those aspects of the game taking place in Ohio. The state's view of the multi-state lottery is difficult to accept. Without confusing the question with excessive nuance, we note it is clear that one drawing will be held to determine a winner from among all participants purchasing tickets in all nine states; the commission is not the only agency selling rights or awarding prizes in the game. In the long run, Ohio undoubtedly would receive prize contributions from other states roughly corresponding to the proportionate share of sales generated within Ohio. In the short term, averages being only averages, Ohio could experience a net outflow of funds controlled, as far as the condition of sale and award is concerned, by the lottery commissions of the other participating states.
 {¶ 36} While this aspect of the multi-state lottery is clearly a concern, it is adequately addressed by the terms under which Ohio has agreed to participate in the multi-state lottery consortium. Ohio's participation in the Mega Millions game has been structured so that Ohio laws and rules govern in Ohio and supersede the statewide joint lottery agreement. Presumably, the states by agreement and design have caused the rules for the Mega Millions game to harmonize with their respective regulatory schemes, as Ohio has done. In the event of conflict between the provisions of the Multi-State Lottery Agreement and the law of a member state, then "as to that Party Lottery, such constitutional provision, law, rule or regulation shall control." (Joint Lottery Agreement, ¶ 9.1.) The agreement further provides that "any claims or litigation relating to tickets and/or prizes shall be resolved according to the laws of the state wherein the Official Mega Millions Ticket was purchased and must be litigated in said state of purchase." (Joint Lottery Agreement, ¶ 9.2.) Finally, as an ultimate safeguard against Ohio's loss of direction over the game, the agreement specifically provides that Ohio, or any other participating state, with notice may end its agreement with the other participating states and withdraw at will from the multi-state consortium.
 {¶ 37} As long as Ohio's participation in the Mega Millions game is undertaken within Ohio's own regulations and the Mega Millions' rules, which are drafted concordantly with Ohio law and regulation, Ohio maintains sufficient direction of the lottery game to pass constitutional muster. In the case of dissonance between Ohio's lottery regulations and the Mega Millions' rules, Ohio has the absolute and unfettered right to withdraw from the multi-state lottery. In short, the delegation of certain day-to-day aspects of operation of the multi-state game does not cause Ohio to relinquish "direction" over the game, and Ohio's absolute right to withdraw from the game ensures that, as long as Ohio remains in the game, it will be conducted in accordance with Ohio's statutes and regulations. Plaintiffs' third assignment of error is overruled.
 {¶ 38} Plaintiffs' fourth assignment of error asserts that the net proceeds of the multi-state lottery will not be used in their entirety to fund education in Ohio, as required by Section 6, Article XV. Plaintiffs point out that, as the Mega Millions game is currently organized, the states do not share proceeds from ticket sales per se. They nonetheless agree to contribute a share of each jackpot in proportion to the respective state's ticket sales for that jackpot period. In other words, as presently constituted, although Mega Millions is not a revenue-pooling arrangement, it remains a marketing and prize expense-pooling arrangement. From this plaintiffs conclude that, whether Mega Millions is viewed as nine separate lotteries or a single unified game, the net proceeds are not being retained in Ohio. If Mega Millions is nine separate lotteries, then some proceeds from Ohio ticket sales will be used to pay another state's lottery jackpot. If Mega Millions is one unified game, then the entire net proceeds from all ticket sales are not paid to Ohio, since other states largely retain their respective ticket revenues after prize, operating, and marketing expenses are paid through the multi-state consortium.
 {¶ 39} The state points out that the correct definition of "net proceeds" must be understood in this case to include gross revenues less expenses. In traditional Ohio lottery games, revenues will be received from the sale of lottery tickets and fees. Lottery Director Kennedy's deposition testimony described the current lottery accounting process in those games. The first tier of expenses will include commissions paid to lottery retailers, bonuses, and certain smaller prize expenses. The balance is placed in the Lottery Gross Revenue Fund. After further payment of prize expenses, the balance then is placed in the State Lottery Fund. Overhead, including advertising and payroll, is paid from this fund, as well as larger prize expenses, including transfers to the Deferred Prizes Trust Fund. The remaining funds, which the state defines as "net proceeds," are then transferred to the Lottery Profits Education Fund and used for the support of elementary, secondary, vocational and special education programs in the state of Ohio, as required by the constitution.
 {¶ 40} The state convincingly argues that prize payouts to winners holding tickets sold in other Mega Millions states simply constitute a different form of expense to be deducted prior to arriving at a determination of "net proceeds." Prize payouts, whether they are to players of traditional, in-state lottery games or the Mega Millions game, in essence are a promotional expense to foster increased ticket sales with the objective of ultimately increasing net proceeds from the lottery to be paid into the Lottery Profits Education Fund. If the lottery properly is viewed as a scheme by which a state induces citizens to voluntarily tax themselves, then both media advertising and prize payouts in fact constitute promotional expenses, although the above description indicates they are deducted at slightly different points in the lottery accounting process. Applying this reasoning uniformly to in-state and multi-state lottery games, we conclude that the "entire net proceeds" from lottery sales, multi-state or Ohio only, are retained in the state after the deduction of overhead and expenses of all description; those expenses may or may not include funds expended toward a jackpot paid to a ticket holder purchasing his or her ticket in another participating state. Ohio's participation in a multi-state lottery game under these conditions therefore does not violate Section 6, Article XV in this respect, and plaintiffs' fourth assignment of error is overruled.
 {¶ 41} Plaintiffs' fifth assignment of error asserts that H.B. 405 violates the single-subject rule of the Ohio Constitution. Section15(D), Article II, Ohio Constitution, provides that no bill of the General Assembly "shall contain more than one subject, which shall be clearly expressed in its title." The Ohio Supreme Court in Dix, at 145, described the purpose of this provision: "when there is an absence of common purpose or relationship between specific topics in an act and when there are no discernible practical, rational or legitimate reasons for combining the provisions in one act, there is a strong suggestion that the provisions were combined for tactical reasons, i.e., logrolling. Inasmuch as this was the very evil the one-subject rule was designed to prevent, an act which contains such unrelated provisions must necessarily be held to be invalid in order to effectuate the purposes of the rule."
 {¶ 42} Only a "manifestly gross and fraudulent violation" of the single-subject provision will cause a court to find a statute unconstitutional. State ex rel. Ohio Academy of Trial Lawyers v. Sheward (1999), 86 Ohio St.3d 451, 496; Dix at 145. "The mere fact that a bill embraces more than one topic is not fatal, as long as a common purpose or relationship exists between the topics." Sheward at 496. "The one-subject provision is not directed at plurality but at disunity in subject matter." Id., citing Dix at 146, and Hinkle v. Franklin Cty. Bd. of Elections (1991), 62 Ohio St.3d 145, 148. Assessment of an enactment's constitutionality will be primarily a matter of a "case-by-case, semantic and contextual analysis." Dix at 145.
 {¶ 43} No doubt because legislative enactments have been examined on such an individualized basis, the Ohio Supreme Court's precedential rulings in applying the above-stated principles provide somewhat inconsistent guidance. In Sheward, the Supreme Court was confronted with the Tort Reform Act, Am.Sub.H.B. No. 350, which undertook to reform on a comprehensive basis multiple aspects of Ohio's substantive and procedural tort law. Despite the fact that all provisions of the enactment revolved around tort reform, the court found it to violate the single-subject rule:
 {¶ 44} "However, a thorough and in-depth review of Am.Sub.H.B. No. 350 reveals numerous other, more diverse, provisions contained therein; and as we examine the substance and content of these provisions, it becomes apparent that the commonality of purpose or relationship between them becomes increasingly attenuated, and the statement of subject necessary to encompass them grows broader and more expansive, until finally any suggestion of unity of subject matter is illusory. For example, Am.Sub.H.B. No. 350 attempts to combine the wearing of seat belts with employment discrimination claims, class actions arising from the sale of securities with limitations on agency liability in actions against a hospital, recall notification with qualified immunity for athletic coaches, actions by a roller skater with supporting affidavits in a medical claim, and so on. See fn. 6.
 {¶ 45} "With all due respect and deference to the General Assembly, it is simply impossible to uphold the constitutionality of Am.Sub.H.B. No. 350 under the one-subject provision of Section 15(D), Article II of the Ohio Constitution. The various provisions in this bill are so blatantly unrelated that, if allowed to stand as a single subject, this court would be forever left with no basis upon which to invalidate any bill, no matter how flawed." Id. at 497-498.
 {¶ 46} Similarly in Simmons-Harris v. Goff (1999), 86 Ohio St.3d 1, the court struck down the school voucher program enacted by the General Assembly as violative of the single-subject rule. The statutory amendments required to introduce the voucher program were enacted as part of the 1996-1997 bi-annual budget bill, Am.Sub.H.B. No. 117. Although appropriations bills had generally in the past been found by their nature to permissibly aggregate a number of otherwise unrelated items, the court in Simmons-Harris declared that appropriations bills could not be used to logroll substantive programs:
 {¶ 47} "Appropriations bills, of necessity, encompass many items, all bound by the thread of appropriations. * * * Nevertheless, the School Voucher Program was created in a general appropriations bill consisting of over one thousand pages, of which it comprised only ten pages. * * * The School Voucher Program, which is leading-edge legislation, was in essence little more than a rider attached to an appropriations bill. Riders are provisions that are included in a bill that is `"so certain of adoption that the rider will secure adoption not on its own merits, but on [the merits of] the measure to which it is attached."' Dix,11 Ohio St.3d at 143 * * * quoting Ruud, `No Law Shall Embrace More Than One Subject' (1958), 42 Minn.L.Rev. 389, 391. Riders were one of the problems the Dix court was concerned about. Id. The danger of riders is particularly evident when a bill as important and likely of passage as an appropriations bill is at issue. See Ruud at 413 (`[T]he general appropriation bill presents a special temptation for the attachment of riders. It is a necessary and often popular bill which is certain of passage'). * * * [T]here is a `blatant disunity between' the School Voucher Program and most other items contained in Am.Sub.H.B. No. 117. Further, we have been given `no rational reason for their combination,' which strongly suggests that the inclusion of the School Voucher Program within Am.Sub.H.B. No. 117 was for tactical reasons." Id. at 16-17.
 {¶ 48} The state argues persuasively, however, that H.B. 405 in the present case can be distinguished from the legislation at issue in Simmons-Harris, the only other appropriations bill plaintiffs cited as violating the single-subject rule. H.B. 405 had a long and frequently amended history before its final enactment. As first introduced, the bill undertook to correct the distribution of funds for community services, support services, and subsidies to mental health services boards from the General Revenue Fund. The state's financial situation worsened during the pendency of the bill, and it quickly became a vehicle for various other revenue and expenditure adjustments, a "budget correction bill." New taxes were introduced in committee, and then replaced with other possible sources of revenue: expenditures from the Rainy Day Fund, increased expenditures from the tobacco settlement funds, and enhancements to the lottery. In its final form, the state concedes that H.B. 405 contained provisions affecting a multiplicity of Revised Code sections and other topics. All of these topics, however, revolve around the "common thread of appropriation" and revenue, particularly enhancements to revenue. As the state stresses, the Supreme Court acknowledged in Simmons-Harris that budget bills by their nature will contain a multiplicity of items united by the common subject of appropriations for the operation of governmental services in the state of Ohio.
 {¶ 49} In the present case, the provisions authorizing the commission to enter into a new form of lottery game, with the expectation that it would generate an estimated $41 million per year in additional revenues to Ohio schools, maintains a sufficient common thread with the remaining provisions of H.B. 405 which, by the time it was finally enacted, truly had become a budget correction bill primarily concerned with funding. In the words of the trial court, the multi-state lottery provisions "are firmly related to the central appropriations core of the bill." (Trial Court Decision, 45.)
 {¶ 50} Accordingly, this matter is more like that the Ohio Supreme Court considered in ComTech Systems, Inc. v. Limbach (1991),59 Ohio St.3d 96, in which the Supreme Court found that the General Assembly had not violated the single-subject rule by including in the bi-annual budget bill a revenue enhancement in the form of a newly created sales tax on certain computer services and equipment. There, as here, the introduction of a stream of revenue was sufficiently related to the core subject of revenues and expenditures to justify inclusion in an appropriations bill. H.B. 405 does not violate Section 15(D), Article II, Ohio Constitution.
 {¶ 51} We recognize that this court has determined a small segment of H.B. 405 violates the single-subject rule. See State ex rel. Ohio Civ. Serv. Emp. Assn. v. State Emp. Relations Bd. (2003),152 Ohio App.3d 551, 2003-Ohio-2021. As we explained, however, "[i]nvalidity of the subject provision does not affect the other provisions of the enacted bill of which the unconstitutional provision is a part." Id. at ¶ 30. Because, for the reasons noted, H.B. 405 does not violate the single-subject rule, plaintiffs' fifth assignment of error is overruled.
 {¶ 52} Plaintiff's sixth assignment of error asserts that the commission's administrative rules governing the Mega Millions game are invalid because the process of promulgating the new regulations began prior to the effective date of the lottery statute amendments. The non-appropriation provisions of H.B. 405, including the Joint Lottery Provisions, were effective March 14, 2002. On February 14, 2002, however, the commission prepared for the forthcoming changes in lottery law and filed proposed rules with the Joint Committee on Agency Rule Review. Without citing any legal authority to support the proposition, plaintiffs assert that this anticipatory submission of proposed rules violates the procedure for adoption or amendment of administrative rules set forth in R.C. Chapter 119. Since plaintiffs do not state precisely which language in R.C. Chapter 119 prevents proposal, as opposed to promulgation, of rules prior to the enabling legislation's effective date, we see no violation of the letter of the statute.
 {¶ 53} Furthermore, no violation of the spirit of the law can be found either. The clear intent of R.C. Chapter 119 is to provide an opportunity for proponents and opponents of a proposed regulation to present views regarding the advisability and legality of the proposed rules. Northeast Ohio Regional Sewer Dist. v. Shank (1991),58 Ohio St.3d 16. In this case, plaintiffs do not assert the commission failed to follow the notice and hearing requirements of R.C. Chapter 119, but only that initiation of that process was illegally premature.
 {¶ 54} Since the commission's anticipation of the effective date of the statute was permissible, the commission did not violate either the letter or the spirit of R.C. Chapter 119, and plaintiffs' sixth assignment of error is overruled.
 {¶ 55} Plaintiffs' seventh assignment of error similarly asserts that the governor acted prematurely in directing the director of the Ohio Lottery to enter into the multi-state lottery agreement. Plaintiffs' argument is based on the fact that, although H.B. 405's lottery provisions did not take effect until March 14, 2002, the director of the commission testified that the governor directed him in mid-January to enter into the multi-state lottery agreement with the consortium of states promoting the Mega Millions game. The director did not actually enter into the agreement, signing as an "authenticating officer for Governor Bob Taft," until May 14, 2002. The state responds that the director's action in entering into the multi-state lottery agreement was authorized at the time it was undertaken, two months after the effective date of the statute. The state further contends that the governor's direction to do so, even if it pre-dated the effective date of the statute, essentially relates forward to permit the director's act.
 {¶ 56} Neither party has presented legal authority to support their views, nor has our independent research disclosed a case precisely on point. Common sense, however, suggests that the executive branch be allowed to anticipate the effective date of a statute in preparing to effect its intended purpose. As a general proposition, as long as the executive did not actually and prematurely execute an agreement with other states to enter into the multi-state lottery, we see no reason to unduly fetter the governor or his agency heads with an absolute bar on preparing, prior to the effective date of a newly enacted statute, to carry out the executive's duty to put it into force. If the governor's directive to the director be premature, it certainly was never revoked and can be taken as effective as of the effective date of the statute, after which the director in fact entered into the multi-state lottery agreement. Because plaintiffs have failed to articulate any illegality in the timing of the governor's directive to the lottery director, plaintiffs' seventh assignment of error is overruled.
 {¶ 57} The cross-appeal by the state asserts that the trial court erred in finding certain provisions of H.B. 405 are unconstitutional in that they provide for a reduction in school funding from the General Fund directly proportional to the increase in school funding anticipated from participation in the multi-state lottery: "Upon approval by the Governor and the Director of the Ohio Lottery to join a multi jurisdictional lottery * * * the Director of Budget and Management shall increase the fiscal year 2003 appropriation authority in the Department of Education Lottery Profit Education Fund * * * by $41,000,000. This amount is hereby appropriated. The Director of Budget and Management shall also decrease the fiscal year 2003 appropriation authority in the Department of Education [General Revenue Fund] by $41,000,000." (H.B. 405, Section 36.) The trial court found the exchange of funds directly violated Section 6, Article XV, which requires that any net proceeds from any lottery games be used "solely" to support public education in Ohio.
 {¶ 58} Again, this is a matter of first impression, and parties are left to debate, without precedential guidance, the import of the constitutional language and attendant public policy considerations.
 {¶ 59} It generally has been accepted that the 1973 amendment permitting creation of a state lottery was supported on the general premise that the funds would go to education, even though no explicit language to that effect was included in the original amendment. This widespread sentiment was reflected in the further amendment, effective January 1, 1988. The language added to Section 6, Article XV, specifying that lottery funds would be used solely for the support of education, crystallized the previously inchoate but generally accepted proposition that the state's participation in promoting a game of chance was rendered acceptable by the objective of securing a net benefit to society through better funding for education in Ohio.
 {¶ 60} The hoped-for increase in education funding from operation of a state lottery has not always been realized, because the legislature has tended to incrementally redirect general fund expenditures away from education in a more or less direct offset to the education funding received from the Lottery Education Fund. The redirection of funds arises from a complex legislative process in which the General Assembly attempts to balance the always-limited resources available to it with the multiple competing demands for governmental programs and services. Cf. § II, para, VIII(c), Art. I, Georgia Const. (providing "[lottery] net proceeds shall be used to support improvements and enhancements for educational programs and purposes and such net proceeds shall be used to supplement, not supplant, non-lottery educational resources for educational programs and purposes"). (Emphasis added.)
 {¶ 61} We are not asked here to address, however, a general course of funding the General Assembly has undertaken over a period of many years in the exercise of its general legislative power. We specifically are asked here only to determine the constitutionality of an enactment which in the same provision, and in fact the very same paragraph, simultaneously (1) authorizes the lottery to undertake a new multi-state game to increase revenues and net proceeds, constitutionally earmarked for education, and (2) in the same breath diverts previously-allocated education expenditures from the General Fund away from education and to other purposes in an amount equal to the anticipated revenues from the new lottery game. As a result, we are directly confronted with a provision which, in the trial court's words, renders fruitless the action of the people of Ohio in amending their constitution to specify that lottery proceeds go to public education. Whether the General Assembly may accomplish that result by enacting two distinct pieces of legislation, we need not determine. Here, we conclude only that the tie is too explicit and the funding offset too direct to avoid the conclusion that this portion of H.B. 405 is a constitutional violation of Section 6, Article XV's mandate that lottery funds must go to public education. Accordingly, the trial court did not err in so concluding, and the state's assignment of error on cross-appeal is overruled.
 {¶ 62} In summary, the provisions of H.B. 405 authorizing the commission, upon direction from the governor, to enter into a multi-state lottery agreement do not violate Section 6, Article XV, Ohio Constitution, nor does the act violate the single-subject rule of Section15, Article II, Ohio Constitution. Further, the promulgation and implementation of the attendant regulations and agreement were lawfully executed. Finally, those provisions in H.B. 405 concerning the offset of General Fund Revenues previously allocated to education by anticipated revenues from the multi-state lottery violate the Section 6, Article XV mandate that all lottery proceeds go to fund education. Having overruled all assignments of error, we affirm the judgment of the trial court.
Judgment affirmed.
BRYANT and LAZARUS, JJ., concur.